**ABKCO MUSIC, INC.,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**HARRISONGS MUSIC, LTD.,** Harrisongs Music, Inc., George Harrison, Apple Records, Inc., Broadcast Music, Inc., and Hansen Publications, Inc., Defendants-Appellees-Cross-Appellants,

v.

**ABKCO INDUSTRIES, INC.** and Allen Klein, Additional Parties with Respect to Counterclaims-Appellants-Cross-Appellees.

**Nos. 505, 600, Dockets 82–7421, 82–7461.**

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1982.

Decided Nov. 3, 1983.

---

Gideon Cashman, New York City (Pryor, Cashman, Sherman & Flynn, New York City, James A. Janowitz, Donald S. Zakarin, New York City, of counsel), for plaintiff-appellant-cross-appellee.

Joseph J. Santora, New York City (Santora Shenkman & Kushel, New York City, Robert B. McKay, New York City, of counsel), for defendants-appellees-cross-appellants.

Cleary, Gottlieb, Steen & Hamilton, New York City (Richard W. Hulbert, Albert S. Pergam, New York City, of counsel), co-counsel for Apple Records, Inc.

Before PIERCE, WINTER and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

## I. BACKGROUND

### A. Events Leading to Liability Trial

On February 10, 1971, Bright Tunes Music Corporation (Bright Tunes), then copyright holder of the song "He's So Fine," composed by Ronald Mack, brought this copyright infringement action in the United States District Court for the Southern District of New York against former member of the musical group "The Beatles" George Harrison, and also against related entities (hereinafter referred to collectively as "Harrison Interests"),[1] alleging that the Harrison composition, "My Sweet Lord," (hereinafter referred to alternatively as "MSL") infringed the Ronald Mack composition, "He's So Fine," (hereinafter referred to alternatively as "HSF").[2]

When this action was commenced, the business affairs of The Beatles, including Harrison Interests, were handled by ABKCO Music, Inc. (ABKCO) and Allen B. Klein, its President and "moving spirit." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 508 F.Supp. 798, 799 (S.D.N.Y.1981).[3] ABKCO was Harrison's business manager during the initial stages of the copyright liability action herein, at which time the litigation was handled for Harrison by ABKCO's General Counsel.

The following events preceded the instant appeal. Shortly after this action was commenced in February, 1971, Klein (representing Harrisongs Music, Inc. and George Harrison) met with Seymour Barash (President and major stockholder of Bright Tunes) to discuss possible settlement of this lawsuit.[4] Although Klein, at trial, denied having specific knowledge of the details of this discussion, he testified that he had suggested to Barash, around February of 1971, a purchase of the entire stock of Bright Tunes as a way to dispose of this lawsuit. Thus, in 1971, Klein was acting on behalf of Harrison Interests in an effort to settle this copyright infringement claim brought by Bright Tunes, although no settlement resulted.

Subsequent to the Klein-Barash meeting, Bright Tunes went into "judicial dissolution

---

1. Suit was brought against Harrisongs Music, Ltd. (Harrison's English company), Harrisongs Music, Inc. (Harrison's American company), Apple Records, Inc. [hereinafter referred to collectively as Harrison Interests], as well as Broadcast Music, Inc. and Hansen Publications, Inc.

2. In 1973, a similar infringement action was brought in England by The Peter Maurice Music Co., Ltd. (Maurice), which in 1963, had received from Bright Tunes an assignment of all copyright rights for HSF worldwide (except the United States and Canada).

3. References to "ABKCO" or to "Klein" are to include ABKCO Music, Inc., its parent ABKCO Industries, Inc., and Allen B. Klein.

4. At this meeting Klein suggested purchasing the entire Bright Tunes catalogue (which included HSF) as a means of resolving the lawsuit, although apparently no precise dollar amount was mentioned. At the same time, Klein informed Barash that Harrison was unwilling to admit to copyright infringement. The substance of this settlement discussion was later recorded in a memorandum to file, dated January 3, 1973, of Eugene E. Murphy (an attorney for Bright Tunes' Receiver). According to Murphy's memorandum, Barash rejected Klein's suggested offer to purchase and counter-offered to pay Harrison half the proceeds of the sale of MSL, with Bright Tunes receiving the other half, but with Harrison surrendering the MSL copyright to Bright Tunes.

proceedings." This infringement action was placed on the district court's suspense calendar on March 3, 1972, and was resumed by Bright Tunes (in receivership) in early 1973. Also in early 1973 (March 31), ABKCO's management contract with The Beatles expired. Bitter and protracted litigation ensued between The Beatles and ABKCO over the winding down of management affairs—a dispute that ended in 1977 with The Beatles paying ABKCO $4.2 million in settlement.

There is some disagreement as to whether further settlement negotiations took place between Harrison Interests and Bright Tunes between 1973 and mid-1975.[5] It appears undisputed, however, that Harrison Interests' attorney at least initiated settlement talks in the late summer of 1975; that in the period October 1975 through February 1976, settlement discussions took place between Bright Tunes' counsel and counsel for Harrison Interests regarding settlement of this infringement action (an offer by Harrison Interests based on United States royalties); and that those discussions were in the 50%/50% or 60%/40% range. These discussions culminated in a $148,000 offer by Harrison Interests in January of 1976 (representing 40% of the United States royalties).

At about the same time (1975), apparently unknown to George Harrison, Klein had been negotiating with Bright Tunes to purchase all of Bright Tunes' stock. That such negotiations were taking place was confirmed as early as October 30, 1975, in a letter from Seymour Barash (Bright Tunes' former President) to Howard Sheldon (Bright Tunes' Receiver), in which Barash reported that there had been an offer from Klein for a substantial sum of money. The same letter observed that "[Klein] would not be interested in purchasing all of the stock of Bright Tunes ... if there was any doubt as to the outcome of this litigation."

In late November 1975, Klein (on behalf of ABKCO) offered to pay Bright Tunes $100,000 for a call on all Bright Tunes' stock, exercisable for an additional $160,000 upon a judicial determination as to copyright infringement. In connection with this offer, Klein furnished to Bright Tunes three schedules summarizing the following financial information concerning "My Sweet Lord": (1) domestic royalty income of Harrisongs Music, Inc. on MSL; (2) an updated version of that first schedule; and (3) Klein's own estimated value of the copyright, including an estimate of foreign royalties (performance and mechanical) and his assessment of the total worldwide future earnings.

Barash considered the Klein offer only a starting point. He thought that a value of $600,000 was more accurate and recommended a $200,000 call, based on a $600,000 gross sales price. Also in December 1975, Barash noted, in a letter to counsel for the Peter Maurice Co., that Harrison Interests' counsel had never furnished a certified statement of worldwide royalties of MSL, but that from conversations between Stephen Tenenbaum (accountant for several Bright Tunes stockholders) and Klein, Bright Tunes had been given that information by Klein.

Shortly thereafter, on January 19, 1976, Barash informed Howard Sheldon (Bright Tunes' Receiver) of the Klein offer and of the Bright Tunes stockholders' unanimous decision to reject it. Barash noted that "[s]ince Mr. Klein is in a position to know the true earnings of 'My Sweet Lord,' his offer should give all of us an indication of the true value of this copyright and litigation." Sheldon responded in a letter dated January 21, 1976, noting, inter alia, that Harrison's attorneys were informed that no settlement would be considered by Bright Tunes until total sales of MSL were determined after appropriate figures were checked.

On January 30, 1976, the eve of the liability trial, a meeting was held by Bright

---

**5.** According to Harrison's attorney, on September 9, 1975 Bright Tunes was offered $50,000 in settlement of the United States and Canadian rights; Bright Tunes counter-offered with a demand of $150,000; and in October 1975 the Harrison offer rose to $100,000, making the parties arguably close to an agreed settlement figure.

Tunes' attorney for all of Bright Tunes' stockholders (or their counsel) and representatives of Ronald Mack. The purpose of the meeting was to present Bright Tunes with an offer by Harrison Interests of $148,000, representing 40% of the writers' and publishers' royalties earned in the United States (but without relinquishment by Harrison of the MSL copyright). At the time, Bright Tunes' attorney regarded the offer as "a good one." 508 F.Supp. at 802. The Harrison offer was not accepted, however. Bright Tunes raised its demand from 50% of the United States royalties, to 75% worldwide, plus surrender of the MSL copyright. The parties were unable to reach agreement and the matter proceeded to trial.

*B.  Liability Trial and Events Thereafter*

A three-day bench trial on liability was held before Judge Owen on February 23–25, 1976. On August 31, 1976 (amended September 1, 1976), the district judge rendered a decision for the plaintiff as to liability, based on his finding that "My Sweet Lord" was substantially similar to "He's So Fine" and that Harrison had had access to the latter. *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.,* 420 F.Supp. 177 (S.D.N.Y.1976). The issue of damages and other relief was scheduled for trial at a later date.

Following the liability trial, Klein, still acting for ABKCO, continued to discuss with Bright Tunes the purchase of the rights to HSF. During 1977, no serious settlement discussions were held between Bright Tunes and Harrison Interests. Indeed, the record indicates that throughout 1977 Bright Tunes did not authorize its attorneys to give Harrison a specific settlement figure. By November 30, 1977, Bright Tunes' counsel noted that Klein had made an offer on behalf of ABKCO that "far exceeds any proposal that has been made by the defendants." [6]

On February 8, 1978, another settlement meeting took place, but no agreement was reached at that meeting. Although it appears that everyone present felt that the case should be settled, it also appears that there were no further settlement discussions between Harrison Interests and Bright Tunes subsequent to that date. The Bright Tunes negotiations with ABKCO, however, culminated on April 13, 1978, in a purchase by ABKCO of the HSF copyright, the United States infringement claim herein, and the worldwide rights to HSF, for $587,000, an amount more than twice the original Klein (ABKCO) offer. This purchase was made known to George Harrison by Klein himself in April or May of 1978. Harrison "was a bit amazed to find out" about the purchase.[7]

---

**6.** In a letter dated November 30, 1977 from Bright Tunes' counsel to the attorney for the estate of composer Ronald Mack, Tenenbaum and Sheldon, Klein's offer was set forth in detail: acquisition of the rights to HSF, including Bright Tunes' damages claim against Harrison Interests herein, in exchange for (1) payment of $150,000 to the estate of Ronald Mack (ten-year annuity of $15,000 per year); (2) payment to Bright Tunes' Receiver of either (a) $350,000 plus $50,000 for payment of legal fees incurred by Bright Tunes thus far, or (b) payment of $350,000 and agreement to turn over to Bright Tunes' Receiver or stockholders such legal fees and interest as may be awarded by the court at the conclusion of the action. Klein would agree that if the action were settled prior to an award, he would pay an additional $100,-000 in lieu of court awarded interest and attorneys fees.

In July 1977, the English infringement action between The Peter Maurice Music Company and Harrison was settled. Pursuant to that

settlement, Harrisongs, Ltd. was to pay to Maurice 40% of the past and future monies received through exploitation of the MSL copyright in the United Kingdom, and the parties were to use "their best endeavours" to secure similar settlements throughout the remainder of the Maurice territory (*i.e.,* foreign claims other than those arising in the United States and Canada). The agreement was embodied in an order of the High Court of Justice on June 30, 1977. This settlement was strongly opposed by Bright Tunes.

**7.** Some time after the April 1978 purchase of HSF by ABKCO, ABKCO contends that it offered to sell to Harrison Interests what it had purchased, for a price of $700,000 ($113,000 over ABKCO's purchase price from Bright Tunes). It is unclear, however, whether this offer was for the totality of what Klein had bought from Bright Tunes. In any event, this offer was not accepted.

## C. Damages Proceedings and Foreign Settlements

On July 17, 1978, ABKCO adopted Bright Tunes' complaint and was substituted as the sole party plaintiff in this action. In May 1979, Harrison Interests obtained leave to assert affirmative defenses and counterclaims against Klein and ABKCO for alleged breaches of fiduciary duty relating to the negotiation for and purchase of the Bright Tunes properties.[8] An eight-day bench trial was held on damages and counterclaims between August 27 and October 15, 1979.

While the matter was still *sub judice,* Harrison Interests, on April 3, 1980, entered into an agreement with Essex Music International, Ltd. (Essex), authorizing Essex to negotiate and enter into settlement agreements, on a 60%/40% basis, on behalf of Harrison Interests throughout the world (except the United Kingdom, the United States and Canada) with any party owning an interest in HSF. These terms were consistent with those of the Maurice-Harrison settlement of the United Kingdom claim, whereby the parties were to use "best endeavours" to obtain 60%/40% settlements throughout the world.[9] ABKCO then settled foreign claims with Essex, also on April 3, 1980.

The damages decision was filed on February 19, 1981. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 508 F.Supp. 798 (S.D.N.Y.1981). Having determined that the damages amounted to $1,599,987, the district judge held that ABKCO's conduct over the 1975–78 period limited its recovery, substantially because of the manner in which ABKCO had become a plaintiff in this case. Particularly "troublesome" to the court was "Klein's covert intrusion into the settlement negotiation picture in late 1975 and early 1976 immediately preceding the trial on the

merits." *Id.* at 802. He found, *inter alia,* that Klein's status as Harrison's former business manager gave special credence to ABKCO's offers to Bright Tunes and made Bright Tunes less willing to settle with Harrison Interests either before or after the liability trial. Moreover, the court found that in the course of negotiating with Bright Tunes in 1975–76, Klein "covertly furnished" Bright Tunes with certain financial information about MSL which he obtained while in Harrison's employ as business manager. The foregoing conduct, in the court's view, amounted to a breach of ABKCO's fiduciary duty to Harrison. The court held that although it was not clear that "but for" ABKCO's conduct Harrison Interests and Bright Tunes would have settled, he found that good faith negotiations had been in progress between the parties and Klein's intrusion made their success less likely, since ABKCO's offer in January 1976 was viewed by Bright Tunes as an "insider's disclosure of the value of the case." *Id.* at 803. Consequently, the district judge directed that ABKCO hold the "fruits of its acquisition" from Bright Tunes in trust for Harrison Interests, to be transferred to Harrison Interests by ABKCO upon payment by Harrison Interests of $587,000 plus interest from the date of acquisition.

## II. ABKCO'S ARGUMENTS ON APPEAL

ABKCO presents two principal arguments on appeal. First, it is argued that ABKCO did not breach its fiduciary duty to Harrison because (a) no confidential information was improperly passed from ABKCO to Bright Tunes during the negotiations to purchase HSF, and (b) there was no causal relationship between ABKCO's actions and Harrison Interests' failure to obtain settlement. Second, appellant ar-

---

**8.** Specifically, Harrison Interests alleges that the following conduct by Klein and ABKCO constituted such breaches of duty: (1) clandestine interference with Harrison Interests' settlement efforts; (2) covert furnishing of MSL financial data to Bright Tunes in connection with ABKCO's own efforts to obtain the HSF copyright; (3) covert furnishing to Bright Tunes of Klein's personal estimates of MSL financial ex-

pectations; (4) sideswitching in the present litigation; (5) use of information acquired as a fiduciary in prosecuting this action after the purchase of HSF; and (6) use of confidential information to compete with Harrison Interests and wrongful appropriation of an opportunity rightfully belonging to Harrison Interests.

**9.** *See supra* note 6.

gues that the scope of the constructive trust imposed by Judge Owen is too broad because it covers foreign rights. ABKCO contends that the remedy thus jeopardizes the post-liability-trial settlements of the foreign infringement claims between ABKCO and Harrison Interests (through Essex). As to the first contention, we reject appellant's arguments and affirm the decision of the district judge. With respect to appellant's objection to the scope of the remedy, however, we modify the judgment and remand the case for further consideration in light of this opinion.

### A. Breach of Fiduciary Duty

■ There is no doubt but that the relationship between Harrison and ABKCO prior to the termination of the management agreement in 1973 was that of principal and agent, and that the relationship was fiduciary in nature. *See Meese v. Miller,* 79 A.D.2d 237, 241, 436 N.Y.S.2d 496, 499 (4th Dep't 1981). The rule applicable to our present inquiry is that an agent has a duty "not to use confidential knowledge acquired in his employment in competition with his principal." *Byrne v. Barrett,* 268 N.Y. 199, 206, 197 N.E. 217, 218 (1935). This duty "exists as well after the employment is terminated as during its continuance." *Id.; see also Restatement (Second) of Agency* § 396 (1958). On the other hand, use of information based on general business knowledge or gleaned from general business experience is not covered by the rule, and the former agent is permitted to compete with his former principal in reliance on such general publicly available information. *Byrne v. Barrett,* 268 N.Y. at 206, 197 N.E. at 218; *Restatement (Second) of Agency* § 395 comment b (1958). The principal issue before us in the instant case, then, is whether the district court committed clear error in concluding that Klein (hence, ABKCO) improperly used confidential information, gained as Harrison's former agent, in negotiating for the purchase of

Bright Tunes' stock (including HSF) in 1975–76.

■ One aspect of this inquiry concerns the nature of three documents—schedules of MSL earnings—which Klein furnished to Bright Tunes in connection with the 1975–76 negotiations. Although the district judge did not make a specific finding as to whether each of these schedules was confidential, he determined that Bright Tunes at that time was not entitled to the information. 508 F.Supp. at 803. It appears that the first of the three schedules may have been previously turned over to Bright Tunes by Harrison. The two additional schedules which Klein gave to Bright Tunes (the detailed updating of royalty information and Klein's personal estimate of the value of MSL and future earnings) appear not to have been made available to Bright Tunes by Harrison. Moreover, it appears that at least some of the past royalty information was confidential.[10] The evidence presented herein is not at all convincing that the information imparted to Bright Tunes by Klein was publicly available. *Cf. Franke v. Wiltschek,* 209 F.2d 493, 495 (2d Cir.1953) (former fiduciary precluded from using confidential information in competition with former principal even if the information is readily available from third parties or by other means). Furthermore, the district judge was in a better position to assess the credibility aspects of evidence bearing on this question than we are.

Another aspect of the breach of duty issue concerns the timing and nature of Klein's entry into the negotiation picture and the manner in which he became a plaintiff in this action. In our view, the record supports the position that Bright Tunes very likely gave special credence to Klein's position as an offeror because of his status as Harrison's former business manager and prior coordinator of the defense of this lawsuit. *See, e.g.,* letter from Barash to Sheldon, dated January 19, 1976 ("Since Mr.

---

**10.** For example, the royalty *rate* (as opposed to the exact figures which could have been gleaned from trade publications) was considered confidential. In addition, at the damages trial, the parties stipulated that certain Capitol Records information be kept confidential.

Klein is in a position to know the true earnings of My Sweet Lord, his offer should give all of us an indication of the true value of this copyright and litigation."). To a significant extent, that favorable bargaining position necessarily was achieved because Klein, as business manager, had intimate knowledge of the financial affairs of his client. Klein himself acknowledged at trial that his offers to Bright Tunes were based, at least in part, on knowledge he had acquired as Harrison's business manager.

Under the circumstances of this case, where there was sufficient evidence to support the district judge's finding that confidential information passed hands, or, at least, was utilized in a manner inconsistent with the duty of a former fiduciary at a time when this litigation was still pending, we conclude that the district judge did not err in holding that ABKCO had breached its duty to Harrison.

We find this case analogous to those "where an employee, with the use of information acquired through his former employment relationship, completes, for his own benefit, a transaction originally undertaken on the former employer's behalf." *Group Association Plans, Inc. v. Colquhoun,* 466 F.2d 469, 474 (D.C.Cir.1972); *cf. Renz v. Beeman,* 589 F.2d 735, 746 (2d Cir.1978) (opportunity for purchase that comes to [trustee] while in fiduciary capacity compels trustee to give right of first refusal to trust estate), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *Meinhard v. Salmon,* 249 N.Y. 458, 467, 164 N.E. 545, 548 (1928) ("[T]here may be no abuse of special opportunities growing out of a special trust as manager or agent."). In this case, Klein had commenced a purchase transaction with Bright Tunes in 1971 on behalf of Harrison, which he pursued on his own account after the termination of his fiduciary relationship with Harrison. While the initial attempt to purchase Bright Tunes' catalogue was several years removed from the eventual purchase on ABKCO's own account, we are not of the view that such a fact rendered ABKCO unfettered in the later negotiations. Indeed, Klein pursued the later discussions armed with the intimate knowledge not only of Harrison's business affairs, but of the value of this lawsuit—and at a time when this action was still pending. Taking all of these circumstances together, we agree that appellant's conduct during the period 1975–78 did not meet the standard required of him as a former fiduciary.

In so concluding, we do not purport to establish a general "appearance of impropriety" rule with respect to the artist/manager relationship. That strict standard—reserved principally for the legal profession—would probably not suit the realities of the business world. The facts of this case otherwise permit the conclusion reached herein. Indeed, as Judge Owen noted in his Memorandum and Order of May 7, 1979 (permitting Harrison Interests to assert counterclaims), "The fact situation presented is novel in the extreme. Restated in simplest form, it amounts to the purchase by a business manager of a known claim against his former client where, the right to the claim having been established, all that remains to be done is to assess the monetary award." We find these facts not only novel, but unique. Indeed, the purchase, which rendered Harrison and ABKCO adversaries, occurred in the context of a lawsuit in which ABKCO had been the prior protector of Harrison's interests. Thus, although not wholly analogous to the side-switching cases involving attorneys and their former clients, this fact situation creates clear questions of impropriety. On the unique facts presented herein, we certainly cannot say that Judge Owen's findings and conclusions were clearly erroneous or not in accord with applicable law.

■ Appellant ABKCO also contends that even if there was a breach of duty, such breach should not limit ABKCO's recovery for copyright infringement because ABKCO's conduct did not cause the Bright Tunes/Harrison settlement negotiations to fail. *See* 508 F.Supp. at 803 & n. 15. Appellant urges, in essence, that a finding of breach of fiduciary duty by an agent, to be actionable, must be found to have been the proximate cause of injury to the principal. We do not accept appellant's proffered causation standard. An action for breach of

fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach. *See Diamond v. Oreamuno,* 24 N.Y.2d 494, 498, 248 N.E.2d 910, 912, 301 N.Y.S.2d 78, 81 (1969) ("[T]he function of [an action founded on breach of fiduciary duty] ... is not merely to compensate the plaintiff for wrongs committed by the defendant but ... 'to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.'") (emphasis in original). Having found that ABKCO's conduct constituted a breach of fiduciary duty, the district judge was not required to find a "but for" relationship between ABKCO's conduct and lack of success of Harrison Interests' settlement efforts.

■ ABKCO argues further that the offer to sell substantially what had been gained in the purchase from Bright Tunes to Harrison for $700,000, and Harrison's rejection of that offer, *see supra* note 7, bars Harrison Interests from obtaining a constructive trust in this action, *per Turner v. American Metal Co.,* 268 A.D. 239, 50 N.Y.S.2d 800 (1st Dep't 1944) (where former fiduciary offers former employer what he obtained in violation of fiduciary duty at price equivalent to his cost of acquisition and former employer refuses offer, fiduciary not held liable for breach of duty), *appeal dismissed,* 295 N.Y. 822, 66 N.E.2d 591 (1946). We find this argument unpersuasive. First, in *Turner,* unlike the case at bar, there was no finding of breach of fiduciary duty. Moreover, we find somewhat disingenuous ABKCO's claim that a $700,000 offer was a "price equivalent to his cost of acquisition," which had been $587,000. In any event, it is unclear whether that which ABKCO offered Harrison Interests was equivalent to that which ABKCO had bought from Bright Tunes.

■ Finally, on the facts herein, we agree that a constructive trust on the "fruits" of ABKCO's acquisition was a proper remedy. *See Meinhard v. Salmon,* 249 N.Y. at 467, 164 N.E. at 548 ("A constructive trust is then the remedial device

through which preference of self is made subordinate to loyalty to others."); *In re: McCrory Stores Corp.,* 12 F.Supp. 267, 269 (S.D.N.Y.1935) (agent prohibited from making profit by acquiring claims against principal (debtor) at discount immediately after resignation and enforcing them at greater amount); *see also Restatement of Restitution* § 200 (1937) (where fiduciary in violation of duty to beneficiary acquires property through use of confidential information, he holds the property so acquired in constructive trust for beneficiary); *Restatement (Second) of Agency* § 403 (1958) comment (d) (agent employed to settle claim who purchases the claim for himself holds such claim as a constructive trustee of the principal).

### B. Scope of Constructive Trust: Foreign Settlements

Finally, appellant asserts that if this court is to affirm the district judge's finding of breach and its imposition of a constructive trust, the scope of that constructive trust should be limited to the American infringement claim. Appellant's argument is two-fold. First, appellant contends that because Harrison insisted on settling only the American infringement claim throughout the negotiations, and because the complaint in this case related only to the American claim, the remedy should be limited to that claim. Second, appellant argues that because the constructive trust encompasses foreign rights, the remedy serves to disturb settlement agreements that have already been achieved as to the foreign infringement claims against Harrison. As to appellant's first contention, in our view the district judge was not constrained by the scope of the settlement negotiations in fashioning this equitable relief. Moreover, it was within the discretion of the district court to provide a remedy not simply as to appellant's claims, but also as to appellee's counterclaims. *See Alexander v. Hillman,* 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935) ("[C]ourts of equity ... will decide all matters in dispute and decree complete relief.").

■ The second point raised by appellant, however, in our view, warrants modifi-

cation of the judgment and remand to the district court for reassessment of the scope of the constructive trust. On April 3, 1980, after the damages trial, but before Judge Owen rendered his opinion, Harrison Interests, through its agent, Essex Music International, with full knowledge that its counterclaim was pending before Judge Owen, voluntarily entered into agreements with ABKCO, settling MSL infringement claims in various foreign territories as between HSF subpublishers and MSL subpublishers. As a general matter, we note first that courts favor the policy of encouraging voluntary settlement of disputes. *See, e.g., Williams v. First National Bank*, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); *In re: Penn Central Transportation Co.*, 445 F.2d 811, 814 n. 6 (3d Cir.), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972); *D.H. Overmyer Co. v. Loflin*, 440 F.2d 1213, 1215 (5th Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971); *Petty v. General Accident Fire and Life Assurance Corp.*, 365 F.2d 419, 421 (3d Cir.1966). Bearing this principle in mind, we conclude that, since the parties or their agents entered into settlement agreements as to certain foreign infringement claims while the damages issues were *sub judice*, the trust should not include that portion of ABKCO's acquisition constituting a purchase of the foreign rights involved in those settlements. We remand the case to the district court to determine what portion of the $587,000 paid by ABKCO to Bright Tunes is attributable to the foreign rights involved in the April 3, 1980 settlement. That sum should be subtracted from the $587,000 to determine the amount the Harrison Interests must pay to acquire only the rights not affected by the April 3, 1980 settlement.

## III. CROSS–APPEAL: COPYRIGHT INFRINGEMENT

"[I]t is well settled that copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that the two works are substantially similar." *Warner Brothers v. American Broadcasting Companies*, 654 F.2d 204, 207 (2d Cir.1981). In this case, Judge Owen determined that "My Sweet Lord is the very same song as He's So Fine with different words, and Harrison had access to He's So Fine." *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.*, 420 F.Supp. at 180–81. He concluded that the substantial similarity coupled with access constituted copyright infringement, even though subconsciously accomplished. *See id.* at 180, 181 (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.1936); *Northern Music Corp. v. Pacemaker Music Co.*, 147 U.S.P.Q. 358, 359 (S.D.N.Y.1965)).

Appellees argue on cross-appeal that the instant case differs significantly from those cases relied upon by the district court to support its conclusion of subconscious infringement, and from the only other case in this circuit which held that subconscious copying can constitute infringement, *i.e., Fred Fisher, Inc. v. Dillingham*, 298 F. 145 (S.D.N.Y.1924). In addition, they urge upon this court the position that it is unsound policy to permit a finding of copyright infringement on the basis of subconscious copying. We reject both arguments and affirm the decision of the district judge.

First, we do not find dispositive appellees' distinction between the instant case and the *Sheldon* and *Fisher* cases.[11] Appellees point out that in those two cases, the infringing work was created very shortly after the infringer had had access to the infringed work. Here, in contrast, appellees note, Harrison's access to HSF occurred in 1963, some six years before he composed MSL. We disagree with appellees' position that such temporal remoteness precludes a finding of access. First, Harrison himself

---

11. The other case cited by the district court, *Northern Music Corp. v. Pacemaker Music Corp.*, 147 U.S.P.Q. 358 (S.D.N.Y.1965), simply reiterates the rule stated in *Sheldon* that copying may be subconscious. *Id.* at 359 ("[I]f copying did in fact occur; [sic] it cannot be defended on the ground that it was done unconsciously and without intent to appropriate plaintiff's work.").

admitted at trial that he remembered hearing HSF in the early sixties when it was popular. Moreover, even if there had not been such direct evidence of access, access still may have been found because of the wide dissemination of HSF at that time. *See Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir.1946); 3 M. Nimmer, *Nimmer on Copyright* § 13.02[A] (1983). Indeed, in 1963, the year of Harrison's admitted access to HSF, the song was "Number One on the *Billboard* charts" in the United States for five weeks, and it was one of the "Top Thirty Hits" in England for seven weeks that same year. Thus, even if the evidence, standing alone, "by no means compels the conclusion that there was access . . . it does not compel the conclusion that there was not." *Heim v. Universal Pictures Co.,* 154 F.2d 480, 487 (2d Cir.1946).

■ As to the requisite finding of substantial similarity, we affirm the determinations of the district judge, since we do not find them to be clearly erroneous, *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.,* 420 F.Supp. at 178–80. Even Harrison conceded at trial that the two songs were "strikingly similar" as played by a pianist during the liability trial.

This case is unlike *Darrell v. Joe Morris Music Co.,* 113 F.2d 80 (2d Cir.1940), cited by appellees. In *Darrell,* the Court of Appeals affirmed the district court's finding of no plagiarism, when there had been "substantial identity" between the songs at issue. The *Darrell* court found of particular significance that the songs' themes were trite and access had occurred some seven and a half years before the defendant's song was composed. The court noted:

> [S]uch simple, trite themes as these are likely to recur spontaneously; . . . It must be remembered that, while there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing; and much fewer still suit the infantile demands of the popular ear. Recurrence is not therefore an inevitable badge of plagiarism.

*Id.* at 80. We find this case distinguishable. Indeed, on the facts herein, the district judge did not find repetition of "trite themes," but rather, "a highly unique pattern," 420 F.Supp. at 178. Moreover, in *Darrell,* the court found that the allegedly infringed song "had had very scant publicity" and credited the defendant's denial of ever having heard it. This is unlike the case at bar where HSF had had very substantial dissemination and where Harrison acknowledged that he had heard HSF at least a few times. We accept the *Darrell* court's observation that "recurrence is not . . . an inevitable badge of plagiarism." However, on the facts presented herein, where the similarity was so striking and where access was found, the remoteness of that access provides no basis for reversal.

■ Appellees argue next that it is unsound policy to permit a finding of infringement for subconscious copying, particularly on the facts of this case. They assert that allowing for subconscious infringement brings the law of copyright improperly close to patent law, which imposes a requirement of novelty. *See Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 103 (2d Cir.1951) (" 'independent reproduction of a copyrighted . . . work is not infringement', whereas it is *vis a vis* a patent") (quoting *Arnstein v. Edward B. Marks Music Corp.,* 82 F.2d 275, 275 (2d Cir.1936)). We do not accept this argument.

It is not new law in this circuit that when a defendant's work is copied from the plaintiff's, but the defendant in good faith has forgotten that the plaintiff's work was the source of his own, such "innocent copying" can nevertheless constitute an infringement. *See Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d at 54; *see also* 3 M. Nimmer, *Nimmer on Copyright* § 13.08 (1983). We do not find this stance in conflict with the rule permitting independent creation of copyrighted material. It is settled that "[i]ntention to infringe is not essential under the [Copyright] Act," *Buck v. Jewel-LaSalle Realty Co.,* 283 U.S. 191, 198, 51 S.Ct. 410, 411, 75 L.Ed. 971 (1931); *see also Plymouth Music Co. v. Magnus Organ Corp.,* 456 F.Supp. 676, 680 (S.D.N.Y.1978); 3 M. Nimmer, *Nimmer on Copyright,* § 13.-08 (1983) ("Innocent intent should no more constitute a defense in an infringement action than in the case of conversion of tangi-

ble personalty."). Moreover, as a practical matter, the problems of proof inherent in a rule that would permit innocent intent as a defense to copyright infringement could substantially undermine the protections Congress intended to afford to copyright holders. We therefore see no reason to retreat from this circuit's prior position that copyright infringement can be subconscious.[12]

Because there was sufficient evidence of record to support the district judge's findings of substantial similarity and access, we affirm the finding of copyright infringement.

### IV. CONCLUSION

Having considered all of the parties' arguments on appeal and cross-appeal, we affirm, with modification, the decisions of the district court and remand to the district judge for reassessment of the scope of the remedy, consistent with this opinion. Each party is to bear its own fees and costs.

---

**12.** We note that although a finding of innocent infringement does not affect liability, such a finding might constitute a factor to be considered in the fashioning of remedies in a given case. *See generally* 3 M. Nimmer, *Nimmer on Copyright* § 13.08 (1983), and cases cited therein.