Charles J. BOYLE, Jr., Plaintiff,

v.

**CYBEX INTERNATIONAL, INC.,
heretofore known as Lumex,
Inc., Defendant.**

No. CV 95–4216 (ADS).

United States District Court,
E.D. New York.

Oct. 17, 1996.

**116**

Solomon M. Lowenbraun, New York City, for Plaintiff.

Rains & Pogrebin, P.C., Mineola, New York (Frederick D. Braid and Craig L. Olivo, of counsel), for Defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This is an action to recover damages for breach of a written employment agreement. The contract consists of two letters respectively dated June 2, 1994 (Plaintiff's Exh. 1) and September 26, 1994 (Plaintiff's Exh. 2). On June 2, 1994, the plaintiff Charles J. Boyle, Jr. (the "plaintiff" or "Boyle") and the defendant Lumex, Inc. (the "defendant" or "Lumex") by its President and Chief Executive Officer, James E. George entered into a letter employment agreement (Plaintiff's Exh. 1). The agreement provided for employment by the plaintiff as an executive of Lumex/Cybex for a period of two years from June 2, 1994 at a base salary of $185,000 per year. The plaintiff's salary was increased to $193,500 per year by a resolution of the Board of Directors effective March 8, 1995. The plaintiff actually commenced his employment on July 5, 1994.

This initial agreement was supplemented by another letter agreement dated September 26, 1994 (Plaintiff's Exh. 2) from President George to Boyle which provided, among other things, as follows:

I am extremely pleased that you have decided to join Lumex, Inc. and have every expectation that our relationship will be a tremendous success. However, we need to recognize that work relationships sometimes do not succeed because there is no the right fit between individuals or due to other unforeseen circumstances. Therefore, we believe it is beneficial for both of us to clarify our rights and expectations in the event our relationship does not succeed, as follows:

You shall have the right to terminate your employment relationship with Lumex, Inc. at any time with two weeks notice.

*Lumex, Inc. shall have the right to terminate your employment for cause at any time.* In the event you are terminated for cause, your employment relationship with Lumex will end immediately and you will not be entitled to any further payments other than salary and benefits earned as of the date of termination. *Cause can be defined as unethical behavior, theft, embezzlement or immoral behavior.*

If terminated without cause within the first two years of employment, you will receive a salary for the remaining portion of the two years following your termination date. Within the term of the two year employment period, you agree to a non-compete commitment. (emphasis supplied)

During the time of his employment, the plaintiff acted in an executive capacity, namely as President of Cybex International, Inc. ("Cybex") and as Vice President of Lumex. On May 30, 1995, after approximately 11 months on the job, the plaintiff was terminated. The sole liability issue in this breach of contract action is whether the plaintiff was terminated "for cause."

## I. *THE PLEADINGS*

The second amended complaint consists of three claims or causes of action. The first claim is to recover damages for breach of the employment contract, seeking the loss of salary for the unexpired term in the sum of $209,625. The second claim, similarly for breach of the written employment agreement, seeks damages for loss of stock option rights in the sum of $11,250. The third claim alleging a malicious, arbitrary and capricious discharge, was dismissed by the Court at the end of the plaintiff's case for the reasons stated in the record.

In the defendant's answer to the second amended complaint, in addition to certain denials, the defendant pleaded "As and For a First (and only) Defense," as follows:

14. That on or about May 25, 1995, Defendant terminated Plaintiff for cause within the meaning of their agreement and therefore has no further obligation to Plaintiff under the terms of their agreement.

## II. *WAS THERE A TERMINATION FOR CAUSE?*

As stated above, the sole issue in this breach of contract case is whether the termination of the plaintiff on May 30, 1995, was "for cause," within the terms of this contract. Point one in the plaintiff's "Post–Trial Memorandum of Law" states that the "Defendant's witnesses are incredible." The Court disagrees. On the contrary, the Court finds that all of the witnesses, including the plaintiff and the defendant's witnesses, were generally credible witnesses.

### A. *The Reasons Advance by the Defendant.*

The defendant raised a number of reasons for the plaintiff's termination "for cause." However, the Court finds that only three of the reasons could validly be considered on the issue of a discharge "for cause." The first reason involves a product called the AB Trainer, which was an exercise device patented by a company named Precise Exercise Equipment, Inc. ("Precise"). Cybex acquired the rights to manufacture and market the AB Trainer. In the Lumex 1994 Annual Report (Plaintiff's Exh. 11), it is stated:

CYBEX also formed a business relationship with Precise Exercise Equipment Inc., the developers of the AB Trainer, an exciting new product which safely and comfortably exercises abdominal muscles while providing cervical and lumbar support. CYBEX will manufacture and market this product family in consumer, club and clinical markets worldwide.

Boyle was very enthusiastic about the AB Trainer. At a Board of Directors ("Board") meeting on May 1, 1995, Boyle recommended that Cybex promote the AB Trainer in the consumer retail market by way of a television infomercial. When the Board raised concerns about the risky expense involved in such an advertising program, Boyle told the Directors, in words or substance, that if Cybex did not agree to undertake this infomercial promotional program, he, personally, would do so. The defendant contends that this was an act of disloyalty and constituted unethical behavior.

The second reason advanced by the defendant in support of the "for cause" termination, was that instead of relocating from Pennsylvania to Long Island, where the company has its headquarters, the plaintiff purchased two homes in Austin, Texas, and made that distant locale his permanent residence.

The third reason proffered by the defendant and considered by the Court, was that the plaintiff allowed Lumex to expend the sum of approximately $18,000 for relocation expenses with regard to storing his personal property in Pennsylvania, when he intended to and did move to Austin, Texas, rather than to Long Island.

The Court will now review the testimony with regard to the defendant's affirmative defense of a termination "for cause" and will make findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Colonial Exchange Ltd. Partnership v. Continental Casualty Co.,* 923 F.2d 257 (2d Cir.1991).

## B. *First Reason—The Plaintiff's Conduct with Regard to the AB Trainer.*

As stated above, the plaintiff was a vigorous proponent of the AB Trainer. Boyle testified that at the May 1, 1995 Board meeting he recommended "that we initiate plans to take that product into the consumer retail markets, and that would entail an infomercial, a television infomercial to accomplish that." Concern was raised by the Board about the cost of such a program and that the company had never previously gone in that direction. The Board then instructed Boyle to bring a business plan to the Executive Committee of the Board. Then Boyle made a statement that forms the crux of the first reason for his "for cause" termination. These were his words:

Q What happened after that May 1 meeting—withdraw that.

What did you say with respect to the instructions to prepare a plan, a business plan, for presentation to the board for the June meeting?

A I strongly encouraged the board members to pursue that. I felt it was a very powerful product, a product that had a very high potential in the consumer retail markets, and I indicated that the company because of discussions at the board meeting reflected concern and some criticism about the product and the expenses for it.

I indicated that as I was trying to sell the company on the idea of doing it, that if the company or the board chose not to do it, then I would have strong interests in participating or arranging in some joint venture or off balance sheet method to accomplish that. (Tr. at 49).*

The Court attempted to clarify what Boyle meant when he said he wanted to arrange a "joint venture or off balance sheet method."

THE COURT: I don't understand, Mr. Boyle

You say if the board said no to the project, you would do an off balance sheet? What does that mean?

THE WITNESS: It means, your Honor, if the concern from the board of directors was relative to the expenses that were required to do an infomercial and launch that product into retail markets, a way to mitigate those expenses would be to either take a joint venture partner into our relationship, or arrange for some third-party or parties could do that, where the company could still retain the market rights with the product and enjoy royalties or some other form of income from it.

Realizing that this somewhat unusual statement may be construed as a threat to the Board of Directors, plaintiff's counsel asked Boyle the following questions:

Q Did you in fact do anything in either—what was the phrase you used?

A Balance sheet?

Q In off balance sheet, in connection with the fabrication, manufacture or sale of that particular device?

A No, I did not.

Q Did you have any intent to do so when you made the strong suggestion to the board?

A No.

Q What would you characterize the representation to the board as with respect to your statement to the board?

A I was trying to persuade the board that they should not, because we had not done it before, to be reluctant to consider it. It was a product that we had shown at that stage, and three major fitness show exhibits had very positive comments about. We received favorable press reviews on the product, and we had the enthusiasm of most of the people in the fitness sales force that it would be a successful product. I was trying very hard to persuade the board to consider that. (Tr. at 50).

On cross-examination, Boyle was again asked about what he said to the Board on May 1, 1995 about the AB Trainer project:

Q In fact, you were so committed to this and so concerned about the negative response that you received from the Board on May 1st, that you did say to the Board that if you, Lumex, Inc., are not going to take on this project, then I want to do this myself?

* Tr. refers to the trial transcript.

A I did say I would like to do that. I also said that I would like to do it with the Board's permission, either in a joint venture or an off balance sheet or some third-party arrangement that would be satisfactory, so the income would come back to the corporation.

Q You said that you wanted to do it on your own?

A Yes, but in that context.

Q What exactly did you say to the Board on May 1st?

A I said that I felt so strongly that the Board did not want to do the ab trainer, did not want to do it for the home market, *that I would want to do it myself.* (Tr. at 193–194) (emphasis supplied).

Charles E. Murcott founded Lumex, Inc. in 1947, was President and Chairman at various times, and was on the Board until June 1995. He recalls the events of the May 1, 1995 Board Meeting with regard to the AB Trainer incident, as follows:

My view of this was that in the first place our company has no expertise in this kind of marketing; we sell no other products in this kind of a market; the product was so simple that it would obviously be easy to replicate by any number of people. So, it was a terribly risky thing to do in my view and I think in the view of the rest of the Board.

Therefore, we at this meeting told Chuck that we were very concerned about this and he better give us more information than he had about how we could be assured of success in this venture, and at this meeting *Chuck responded to the Board that if we didn't want to do it, he would do it himself.*

I was shocked by that.

How can a guy who was going to be the chief executive officer of a company tell you that he's going to take a product which the Board of Directors doesn't like and run with it himself? What about his job? (Tr. at 124–125) (emphasis supplied).

Lumex Director Thomas W. Kahle also testified to what occurred at the May 1, 1995 Board meeting:

THE WITNESS: He indicated that he thought that—he indicated that he thought that it was very important that we go forward and that if the company wouldn't back this project, he would back it himself. He would put his own money into it. He indicated that he would do it himself. (Tr. at 308).

On cross-examination of Boyle, it was adduced that the costs for producing and televising an infomercial were indeed substantial. The cost of producing the infomercial was between $300,000 and $600,000; the cost for a media test was from $75,000 to $100,000; and the media campaign itself was projected to cost between $500,000 and 4 million dollars per month. For a six-month period the infomercial for the AB Trainer would cost Cybex "anywhere from 4 million to roughly 25 million." (Tr. at 172) (See Defendant's Exh. A). At the same time, the prospective revenues of Cybex from the consumer market were projected as approximately 1.5 million dollars. The following testimony covers this subject:

Q So at the time you were making this—presenting this plan to the Board to spend anywhere from 3 or $4,000,000 to 24 or $25,000,000 in expense to go into the direct response consumer market, if I understand this chart for the first quarter of '95, total revenues from the consumer market, all consumer market, was 1.5 million dollars, give or take. A little less than 1 and-a-half million dollars.

A Yes.

. . . .

Q So total revenues for the consumer market for the first quarter of 1995 were a little under 1 and-a-half million dollars, and you were coming to the Board with a plan on May 1st to spend anywhere from 3,000,-000 to 24 to $25,000,000 on taking a product into a market that neither you nor the company had any experience in, correct?
A Was not a plan. It was a concept proposing to do what you just said, yes. (Tr. at 174–175).

Other evidence was adduced which tended to establish the strong personal interest that Boyle had in the AB Trainer project. Unknown to the Board at the time of the May 1,

1995 Board meeting, the plaintiff, on April 7, 1995, apparently on his own, had signed a document that appears to be a letter agreement between Stilson & Stilson, a marketing and advertising agency and Cybex. (Defendant's Exh. B). The Court notes that the plaintiff denies that this letter was an "agreement." However, a review of its terms indicates to this Court, that it *is* an agreement. It was signed by Bill Kettel, Vice President of Stilson & Stilson and by Charles J. Boyle, Jr., President of Cybex. Among the provisions of the letter agreement are the following:

4) Cybex will fund the production of the AB Trainer Infomercial at a package price, estimated to be $300,000–$600,000. Payments will be ⅓ due upon completion and approval of script, ⅓ due upon completion of location and studio shooting and the balance is due upon final completion and approval of the infomercial.

5) Cybex will provide $75,000–$100,000 to fund the AB Trainer Infomercial media test.

6) Stilson & Stilson will coordinate and purchase all air time for the AB Trainer Infomercial media test and receive a 15% commission.

7) Cybex will fund the national roll-out media campaign at an estimated $500,000 to $4,000,000 per month (subject to availability) after appropriate "ramp-up" time, which is estimated to be two to four months.

Further, the letter concludes in the following language "Chuck if this agreement is acceptable to you, please sign and fax to us as soon as possible." The agreement was signed by "Charles J. Boyle, Jr., President, Cybex."

Although the Board did not know of this letter agreement at the time the plaintiff was discharged, and so this letter could not be a basis for a "cause" termination, it does provide direct evidence of the intensity of the plaintiff's desire to push the AB Trainer infomercial. Also, with reasonable certainty, when the agreement would have come to the attention of the Board it could have been construed as an abuse of authority by Boyle in committing up to 4 million per month on the infomercial. The Court wonders why Boyle did not bring this letter agreement to the attention of the Board at the time of the May 1st Board meeting. It certainly was relevant to the discussion concerning the AB Trainer and the cost of the program. The fact that the plaintiff failed to reveal this agreement directly relating to the cost of implementing the AB Trainer, provides circumstantial evidence of a deliberate attempt to conceal this material fact from the Board.

In addition, the plaintiff, as President of Cybex, was aware of the "level of (his) authority." The plaintiff's level of authority as of April 1995, was up to the sum of 1 million dollars. (See Defendant's Exh. E). The Stilson contract provided for the potential expenditures in excess of 1 million dollars, and, therefore, required Board approval.

Further evidence was adduced of the plaintiff's strong desire to get personally involved in the AB Trainer program. In September–October 1995, following his termination, Boyle invested $100,000 of his own money in a company called Fitness Innovations and Technology, Inc., that was formed to bring the AB Trainer to the direct response consumer market. Ultimately, this money was returned to Boyle.

### C. *Second Reason—The Plaintiff's Relocation to Austin, Texas*

Immediately following the May 1, 1995 Board meeting, the plaintiff advised Director Thomas W. Kahle and company employees that he was going to purchase a residence and move to Austin, Texas.

Q So if I recall correctly, Mr. Boyle, I think we broke at about the time you were telling us that following the May 1, 1995 Board of Director's meeting you communicated among other things to Mr. Kahle that you were going to move to Austin, Texas?

A That I was going to purchase a residence in Austin, Texas, yes.

Q And that you were going to move to Austin, Texas?

A That we were going to move, my wife and our belongings which had been in storage in Pennsylvania since September

of '94. We had been living, I believe as you recall or as you know in rented accommodations in New York and still had a lease in effect at that time, but we were buying a residence and investing the money from the sale of the Pennsylvania home in Texas.

Q And planning to move to the home in Austin, Texas?

A Yes.

Q And you so told Mr. Kahle on May 1, 1995?

A Yes.

Q Following the Board of Directors meeting?

A Yes.

. . . .

Q Let me ask you to please answer the question.

Did you not tell employees of the Cybex division, members of your staff who reported to you that you were moving to Austin, Texas?

A Yes.

. . . .

Q Did you renew the lease (the Long Island lease) which was a six-month lease that expired in early June of 1995?

A No, I did not.

Q Subsequent to the expiration of that lease in early June of 1995, did you have a permanent residence on Long Island?

A No, I did not.

Q In fact, you never had a permanent residence on Long Island?

A That's correct.

Q And subsequent to the expiration of the lease in early June, you did not have a lease on any property in Long Island, did you?

A I did not.

Q And so as of the expiration of the lease on the property in Long Island in early June of 1995, you had not only the one home that you were just closing on at the end of May in Austin, Texas, but a second home in Austin, Texas, correct?

A Yes.

Q And when did you purchase the first home in Austin, Texas?

A In the fall of 1994, as I recall.

Q Would that be September?

A Yes, as I recall.

Q And in September of 1994, you did not have a lease on any property on Long Island to live in, did you?

A No.

Q So you came to work for Lumex in July of 1994, correct?

A Yes. (Tr. at 207–210).

The plaintiff conceded that, when he entered into his employment agreement with Lumex he was expected to relocate to Long Island. In fact, he told the interviewers that both he and his wife had family who lived or who were living on Long Island. Instead, he moved to Austin, Texas.

Apparently, the Lumex job was the first of many employments of the plaintiff where he did not live near his place of business:

Q Incidentally, when you were working for all of those other corporations and all of those many locations that we went through this afternoon, your wife relocated to be living with you at those locations; is that correct?

A Ultimately, yes.

Q And every single one of them?

A Yes.

Q And while your children were living at home with you, they moved with you too?

A Ultimately, yes. (Tr. at 279).

Lumex had a policy that its senior officers should reside near the company headquarters, on Long Island. As stated by Director Thomas W. Kahle:

Q And does Lumex, Inc., have any policy with respect to where its senior officers reside?

A Yes.

Q What is that policy?

A The policy of the company is that the senior officers reside at the head office of the company.

Q And where is that?

A  The headquarters of the company during all the time in question was here in Long Island.  (Tr. at 295–296).

This testimony was unrefuted.  As a matter of fact, Kahle testified that he discussed Boyle's relocation to Long Island with him, as follows:

We were encouraged and considered it a positive thing in the interview process with Mr. Boyle that he was willing to relocate here, that he indicated to us that he was because of his past employment history and because of his family connections, his family history, he was very familiar with the Long Island area and would have no trouble relocating.

He indicated that his wife's family, I believe, was from the Long Island area, and that would be something that would be no problem.  And we regarded that as a very positive thing.

Q  Was that a significant factor in your consideration about whom to select for the position among the many candidates that you interviewed?

A  Yes, sir, it was.  (Tr. at 299–300).

It is also relevant to note that, although the plaintiff purchased a Texas home in September 1994, he apparently did not reveal this fact until the May 1, 1995 Board meeting.

## D.  *Third Reason—The Relocation Expenses*

As part of his employment agreement, the plaintiff was provided with relocation expenses.  At the time he commenced this job with Cybex, the plaintiff owned a home in York, Pennsylvania.  As stated above, prior to this employment the plaintiff had worked for a number of companies and, in each situation, had moved his residence to the city where his employer-company was located.  For example, he moved his residence to, among other places, Alloy, West Virginia, Rochester, New York, London, England, Ramsey, New Jersey, Seattle, Washington and York, Pennsylvania.  On 11 or 12 prior occasions he had moved his residence to the location of his employer's place of business.

The relocation expenses referred to in the plaintiff's employment agreement, was, obviously, to pay the costs of the plaintiff's move from York, Pennsylvania to Long Island, as the plaintiff conceded when he testified that "the letter (the employment agreement, Plaintiff's Exh. 1) . . . did specify relocation and at the time I entered into it, that (sic) what I thought."  (Tr. at 216).

Of course, the plaintiff's relocation was not to Long Island, where both his company and the Cybex Division was headquartered, but to Austin, Texas, which location had no relation to any Lumex or Cybex facility or function.  While the plaintiff did not personally receive any money for this relocation, he testified that his personal property was removed from his York, Pennsylvania residence by a moving company at the direction of his employer, and placed in storage, which costs were paid for by Lumex.  Boyle's belongings were held in storage in York, Pennsylvania at the expense of Lumex from September, 1994 to May, 1995, a period of eight months.  While the plaintiff did not know the cost of this extended storage, in his termination negotiations with Lumex, he considered an $18,000 "adjustment" he was asked to make to be based on the storage costs paid by Lumex.  (In this regard, see plaintiff's Exhibit 7 in evidence).

The plaintiff conceded that the relocation expenses in the agreement were for the purpose of relocating to Long Island.

Q  You understood that the provision for the relocation expenses in your employment agreement was for the purpose of you relocating to Long Island?

A  My initial discussion with Jim George—

Q  Yes or no?  Was that your understanding of what it was there for?

A  Yes.

Q  So you know that the headquarters of Lumex, Inc., is located on Long Island?

A  Yes.

Q  You knew that when you were taking the job?

A  Yes, sir.

Q In fact, these interviews and everything you were talking about, those took place on Long Island?

A Yes.

Q So you took this job in July, you came to work in July. You were provided with the relocation expense for the purpose of moving to Long Island—

. . . .

Q —Had not leased or bought a residence on Long Island and in the fall of 1994, September, two months after you began work, you purchased a home in Austin, Texas, if I understand your testimony thus far?

. . . .

A Yes.

Q And not only was the Lumex, Inc., headquarters on Long Island, the headquarters for the Cybex division was on Long Island?

A Yes.

Q And you knew that when you took the job?

A Yes.

Q Now, at the time that you purchased your first home in Austin, Texas, in September of 1994, did you own any other residences in Austin, or in Texas at that time?

A No.

Q Then following your announcement to Mr. Kahle and to your employees that you were going to move to Austin, Texas, in May of 1995, you then purchased a second home in Austin, Texas, correct?

A Yes.

Q And you closed on that home on or about May 26th?

A Yes.

Q And in fact, as I think you've indicated your personal belongings which you've not taken out of storage in Pennsylvania, you then moved to Austin, Texas?

A Yes.

Q Your wife moved down to Austin, Texas?

A Yes, she did.

Q You were intending that to be a residence?

A *I was intending that it would be a permanent residence, yes.*

Q Lumex, Inc., doesn't have any facilities in Texas, does it?

A Not to my knowledge, no.

Q And it never did during the time you were working for them?

A No.

Q Now, when you met with Mr. Kahle and Mr. Spratt on May 30th, the subject of your purchasing a residence in Austin, Texas, and announcing that you were moving there and in fact moving there, was a subject of that discussion?

A Yes, it was.

Q One of the issues that they raised with you?

A Yes.

Q In fact, when you went to that meeting with Mr. Kahle in Cincinnati, you flew there from Austin, Texas?

A Yes, I did. (Tr. at 218–221). (emphasis supplied).

Boyle conceded that the $18,000 discussed in connection with negotiations over his severance, "was monies attributable to relocation expenses, whether or not (he) had received them directly or indirectly." (Tr. at 281).

## III. *THE SETTLEMENT NEGOTIATIONS*

Settlements have always been looked on with favor in the Courts. *See for example American Society of Composers v. Showtime/The Movie Channel,* 912 F.2d 563, 580 (2d Cir.1990); *Nestle Co. Inc. v. Chester's Market, Inc.,* 756 F.2d 280 (2d Cir.1985). The Courts favor the policy of encouraging voluntary settlements of disputes. *ABKCO Music, Inc. v. Harrisongs Music Ltd.,* 722 F.2d 988 (2d Cir.1983). However, in most cases, Rule 408 of the Federal Rules of Evidence bars the introduction of a settlement offer for the purpose of proving liability. *Banker v. Nighswander,* 37 F.3d 866 (2d Cir.1994).

The parties in a contractual controversy, such as this one, where there are disputed

issues, often try to amicably dispose of the matter "in order to avoid resolving their controversy through a course of litigation." *McCleary v. Armstrong World Industries, Inc.*, 913 F.2d 257, 259 (5th Cir.1990).

■ The plaintiff apparently points to the extended settlement negotiations between the attorneys for the respective parties and certain documents in this regard as evidence of an admission of liability by the defendant. The Court disagrees. The parties did try to negotiate an amicable adjustment of this matter. There were advantages to each side to amicably settle this situation. These negotiations were unsuccessful. At that point all bets were off. The parties were then free to litigate this matter; the plaintiff to attempt to recover his full salary and stock options; the defendant to deny any liability at all under the contract. The settlement negotiations were just as the words indicate, unconsummated negotiations that were not binding on either party, leaving the parties free to adjudicate this matter in court, and here we are.

## IV. *THE STANDARDS INVOLVING A TERMINATION "FOR CAUSE"*

The employment agreement expressly states that "Lumex, Inc. shall have the right to terminate your employment *for cause* at any time." (Emphasis supplied). In addition, the agreement provides that "Cause can be defined as unethical behavior, theft, embezzlement or immoral behavior." Although this clause is somewhat ambiguous, for the purposes of this decision, the Court will interpret the "for cause" provision to relate only to the four reasons expressly stated in the agreement, namely, unethical behavior, theft, embezzlement or immoral behavior.

The plaintiff offered in evidence another agreement, a "change in control agreement," dated January 20, 1992 (Plaintiff's Exh. 17), which also has a definition of "cause." The Court finds that the purpose of the "change in control agreement" was to deter a "takeover" of the corporation by increasing the cost of such a procedure. It was a different purpose than the agreement at issue, which is a "run of the mill" employment agreement.

■ A review of the law reveals that generally, the meaning of the words "for cause" in an employment agreement depends on, (1) chiefly, the definitions in the agreement, (2) the intent of the parties, and (3) the facts and circumstances of each particular case.

Thus, a review of other cases with different contractual language, different circumstances and different "for cause" reasons, is of limited assistance. Each case stands on its own facts.

In the Court's view, the phrase "unethical behavior" is the relevant point of inquiry in this case. Acts of "unethical conduct" do not rise to the level of "theft," "embezzlement" or "immoral behavior." One of the definitions of unethical in Black's Law Dictionary is "not according to business or professional standards." The word "ethical" is defined as "conforming to professional standards of conduct." As long ago as 1943 a Supreme Court Justice in Queens County decided, in *Kraushaar v. LaVin*, 181 Misc. 508, 42 N.Y.S.2d 857, 859 (1943), that the definition of the word "unethical" includes, in part, "not according to business or professional standards."

It is interesting to note that in the plaintiff's "Post–Trial Memorandum of Law," plaintiff's counsel refers to Section 716 of the New York Business Corporation Law, which provides, in part, that "the removal of an officer without cause shall be without prejudice to his contract rights." In this case, of course, the plaintiff had a right under the contract to be terminated only "for cause." While not binding on the Court in a case such as this, where the parties entered into a written employment agreement, the Court also notes that Section 715 of the New York Business Corporation Law provides that "An officer shall perform his duties as an officer in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

## V. *CONCLUSIONS*

The Court finds that the defendant Cybex International, Inc. formerly known as Lumex, Inc., has established, by a preponder-

ance of the credible evidence, that it terminated the plaintiff Charles J. Boyle, Jr. for cause. The Court further finds that the three reasons advanced by the defendant, individually as well as collectively, provide a basis for a cause termination under the agreement.

As to the first reason, the Court finds that the plaintiff's assertion that he would personally take over the AB Trainer was an act of disloyalty which constituted unethical conduct. In the May 1, 1995 meeting, the plaintiff's plan for advertising the product by an infomercial was not turned down in its entirety. The Board asked him to prepare a detailed business plan and present it to the Executive Board. That was not good enough for the plaintiff. He said, "If (the Board) didn't want to do it, he would do it himself." The plaintiff's action involved a valuable product under a license agreement to Boyle's employer. This was not an asset for Boyle's personal use. The Court finds that a reasonably prudent Board of Directors would view that statement as an act of disloyalty and a departure from good and accepted business or professional standards.

In addition, on April 7, 1995, Boyle surreptitiously entered into an agreement with Stilson & Stilson with regard to advertising the AB Trainer by infomercials at a potential expenditure far in excess of his authorized level of authority. Boyle's action in entering into this unauthorized agreement and concealing it from the Board constituted unethical behavior.

The Court finds that the second reason, the plaintiff's concededly unauthorized relocation of his residence to Austin, Texas, was also contrary to the usual professional or business standards. The plaintiff admitted that it was understood that he was to relocate to Long Island, the headquarters of both the Cybex Division and Lumex. Yet, without permission or even notice to the Board, he buys two homes in Austin, Texas. He purchased the first home in September 1994, obviously intending to make Austin his permanent residence, yet he concealed this activity for eight months. The Court finds that this move to Texas would have to cause inconvenience, delay and other problems with regard to the plaintiff's executive and managerial duties. Boyle was the President of Cybex and a Vice President of Lumex. In such an important position, fax or no fax, e-mail or no e-mail, he would have to be available in person in many situations, at a moments notice. Especially coupled with the third reason—the relocation costs—the Court finds this unauthorized move to Texas was unethical behavior on the part of the plaintiff.

Finally, the Court finds that permitting Lumex to pay relocation expenses, in the sum of $18,000, to store the plaintiff's personal property, knowing that the company was paying this money intending for him to relocate to Long Island and would never have expended this money to provide for his relocation to Texas, was a departure from the usual business and professional standards.

For approximately ten months, the plaintiff stored his personal property at company expense knowing that he was going to move to Texas and not Long Island. In the Court's view, an ethical executive would have revealed this plan to the company and afforded the Board the option as to whether to pay such relocation expenses.

While the Court finds that each of the three reasons constituted "unethical behavior" sufficient to justify a "cause" termination by the terms of the agreement, the totality of the circumstances involving the three reasons compels such a conclusion. The plaintiff, having been terminated "for cause," by the express terms of the employment contract, is not "entitled to any further payments."

Accordingly, Judgment is granted in favor of the defendant Cybex International, Inc., formerly known as Lumex, Inc., dismissing the complaint. The Clerk is directed to enter Judgment in favor of the defendant.