**MILBANK, TWEED, HADLEY & McCLOY, Plaintiff–Appellant,**

v.

**Chan Cher BOON, Defendant– Third–Party–Plaintiff,**

v.

**Tan Sri Dato Wen Tian QUANG, Third–Party–Defendant.**

**Carol Sui Han LEO, Third–Party– Defendant–Counter–Claimant– Appellee,**

v.

**Chan Cher BOON and Milbank, Tweed, Hadley & McCloy, Counterclaim– Defendants.**

**No. 491, Docket 93–7418.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1993.

Decided Jan. 3, 1994.

538

Harvey R. Miller, New York City (Weil, Gotshal & Manges), for plaintiff-appellant.

Andrew S. O'Connor, New York City (Liddle, O'Connor, Finklestein & Robinson), for plaintiff-appellant.

Gerard E. Lynch, New York City (Sara E. Moss, Robert P. Haney, Nancy L. Kestenbaum, Howard, Darby & Levin, of counsel), for third-party-defendant-counter-claimant-appellee.

Before: McLAUGHLIN, JACOBS and REAVLEY,* Circuit Judges.

REAVLEY, Circuit Judge:

The New York law firm of Milbank, Tweed, Hadley & McCloy ("Milbank") appeals from a judgment awarding Carol Sui-Han Leo ("Mrs. Leo") $2,000,000 on her claim that Milbank breached its fiduciary duty to her. After representing Mrs. Leo through her agent, Chan Cher Boon ("Chan"), Milbank represented Chan alone without Mrs. Leo's consent in completing the same transaction. A jury found that Mil-

* Honorable Thomas M. Reavley of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

bank's representation of Chan constituted a breach of fiduciary duty to Mrs. Leo that was a substantial factor in preventing her from obtaining assets she sought in the transaction. We affirm.

## BACKGROUND

*The Leos take an interest in purchasing FOCO Bank*

In late 1984, T.K. Wen, an international investor and Malaysian national, considered purchasing the assets of the bankrupt Deak & Company.[1] Wen was particularly interested in purchasing one of these assets, the stock of Foreign Commerce Bank ("FOCO"), a Swiss bank which a Malaysian national was not permitted to own under Swiss banking laws. Because of this bar, Wen undertook to purchase the bank for his daughter, Mrs. Leo, a U.S. resident living in Denver, Colorado. Wen contacted Mr. Leo's husband, Edmund, in the spring of 1985 and informed him of his intention.

Wen originally acted through Dow Banking Corporation ("Dow"). Milbank was retained by Dow and met Chan, Dow's Singapore counsel, during the course of the negotiations. Dow and those attorneys negotiated a contract with Deak for the FOCO stock, but Deak changed course when it decided that a higher price could be obtained for the FOCO stock if sold in conjunction with its other assets.

Milbank sent a telex to Dow and Wen inquiring whether they were interested in pursuing the FOCO shares together with Deak's other assets. Chan received a copy of the telex and replied in the affirmative. Milbank successfully negotiated a stock purchase agreement for the acquisition of these assets. In doing so Milbank purported to be acting in the name of Chan, but Milbank attorneys at some point during the negotiations became aware that Chan was acting as an agent on behalf of Mrs. Leo.

*The agreement of July 5, 1985*

The agreement signed on July 5, 1985 between Deak and Chan provided for the sale of all of the Deak assets to Chan for a total price of $52 million. However, the transfer was to be made in two stages, and it was not assured that Chan would acquire the assets in the second stage. The first stage included all of the stock of FOCO as well as 49% of the capital stock of Deak U.S. and 200 shares of second preferred stock of Deak National Bank. Chan was to pay the U.S. dollar equivalent of 133 million Swiss francs at this stage. The second stage consisted of the remaining Deak assets, including 51% of Deak U.S., to be transferred in exchange for the remainder of the total purchase price (originally stated to be $52 million) less the amount previously paid for the first stage assets. The agreement was subject to approval by the bankruptcy court, and it allowed the sale of the second stage assets to a different party for a higher price than would be obtained under the terms of the agreement. However, Deak was prohibited from soliciting competing bids for the second stage assets and was required to give notice to Chan of any offers received.

Because the 49% of Deak U.S. stock would be worthless if Chan did not conclude the second stage and obtain the remaining shares and control, the minority shares and preferred stock were placed in escrow along with $8.5 million of the total purchase price. The escrow would be discharged at the close of the second stage. If Chan completed the acquisition, the minority shares and stock would go to Chan and the $8.5 million to Deak's bankruptcy estate. If Chan failed to complete, he would get the $8.5 million back, and the high bidder would get the securities together with the other second stage assets.

Chan reported to the Leos on the success of the negotiations and sought to obtain a power of attorney from Mrs. Leo to permit the opening of a letter of credit on her behalf for the $52 million purchase money. C.E. Eckerman, personal attorney for the Leos in Denver, voiced concerns about the July 5 agreement because it had been signed in Chan's name alone. Eckerman insisted that, before Mrs. Leo authorized the letter of credit, Chan sign a document acknowledging that he was acting as Mrs. Leo's nominee. Eckerman testified at the trial that he called

---

**1.** Chapter 11 proceeding in Southern District of New York.

the attorneys at Milbank at this time and asked them to send a writing acknowledging that Chan was acting for Mrs. Leo. Chan provided the Leos with the requested document stating that he was "acting as nominee for Mrs. Sui–Han Leo in completing the transactions contemplated in the above agreement dated 5th July, 1985." The document was signed by Chan and notarized by Milbank attorney Stephen Shimshak, who forwarded a copy of the letter and the July 5 agreement to Eckerman. Mrs. Leo then authorized Chan as her agent to sign a loan agreement with Dow bank for $52 million.

Milbank claimed at trial that it was unaware of Mrs. Leo's extensive role in the developing transaction, but the evidence proves that some Milbank attorneys were aware of her position. In an internal memo written by Shimshak and circulated to other Milbank attorneys (including partner Barry Radick), the creation of a trust for Mrs. Leo was considered to meet her needs as the purchaser of the FOCO bank. The memo stated "Mr. Chan has requested that Milbank, Tweed advise him on behalf of Mrs. L on these matters" and that "Mr. Chan, on behalf of Mrs. L may be pursuing other … acquisitions." Another note handwritten by Shimshak analyzes the agreement with Chan and refers to "Mrs. L, principal home in Colorado." The writing further briefly mentions "Mrs. L" and her possible interest in various transactions.

*The dollar falls against the franc*

Between the time of the signing of the agreement and the closing of the first stage on August 12, the value of the dollar against the Swiss franc diminished to the point that the 133 million Swiss francs required to close the first stage represented a value in excess of $56.6 million dollars. Mrs. Leo therefore was forced to invest $56.6 million (of which $8.5 million was in the escrow) rather than $52 million. Furthermore, the creditors of Deak then contended that, with or without competitive bids, the estate should receive some additional compensation for the second stage assets—the payment of the first stage having exhausted all of the total price. In a hearing on August 6, Radick on behalf of Chan stated that Chan "has no commitment

to increase his price, but he is prepared to discuss that further with the committee."

When Chan reported to the Leos about this development, a disagreement arose over how to proceed. The Leos were unwilling to increase their investment at this point because they had no information on the actual accounting value of the second stage assets. Mr. Leo told Chan that he wanted more information and wanted to be present at any meetings with the creditors' committee if renegotiation was to take place. Chan's response caused the Leos to doubt Chan's true intentions and to suspect that he might no longer be acting in their best interests. Chan was therefore terminated as Mrs. Leo's agent.

*The agency breaks up*

On October 28, 1985, Eckerman wrote a letter for the Leos to the concerned parties announcing that Chan had been terminated. Eckerman also called Milbank and spoke to Shimshak regarding the discharge of Chan. Eckerman then sent a letter to Shimshak at Milbank on October 28, which stated:

This letter will confirm our telephone conversation regarding Deak & Co., Inc. In the past you have been dealing with Mr. Chan Cher Boon in connection with the acquisition of the FOCO Bank and potential acquisition of Deak & Co., Inc. on behalf of Mrs. Sui Han Leo. Mr. Chan Cher Boon was acting in the role of a nominee, in accordance with the July 9, 1985 letter which you signed as Notary Public. Please be advised that Mr. Chan Cher Boon is no longer authorized to represent Mrs. Sui Han Leo in any manner.

After the quoted letter, Chan advised Milbank that he wanted to proceed on his own with an acquisition of the second stage assets. Milbank attorney Radick testified that after discussions with Chan, he called Eckerman to try to get an understanding of "just what his client's interest was in this so-called back end of the deal." Eckerman's response was that the Leos were prepared to perform the contract. Radick testified that he protested that the contract had been "eaten up" by the Swiss franc, to which Eckerman replied that the Leos were not interested in

paying more or "buying" the remaining assets of Deak.

Milbank recognized the conflict brewing between Chan and Mrs. Leo, and on November 1, Milbank partner Andrew Connick wrote to Eckerman that "as a result of recent developments, Milbank ... will not hereafter represent either Chan Cher Boon or Mrs. Sui Han Leo with respect to any matter relating directly or indirectly to the Stock Purchase Agreement dated July 5, 1985, without the express written consent of both parties." Milbank then sent duplicate copies to Chan and Eckerman of its statement for legal services. On November 8 Radick wrote to both Chan and Eckerman in an attempt to persuade the parties to continue to engage Milbank as counsel on an hourly basis. Radick mentioned in the letter that it was in the best interests of Mrs. Leo to "preserve the benefits of the Escrow agreement."

Mr. Leo testified that Radick later called him inquiring about payment of the bill for legal fees and whether he was still interested in acquiring the second stage assets. According to Mr. Leo, he told Radick that the Leos were still "very interested" in acquiring the second stage but needed more information on the true value of all the assets. The Leos retained Morgan Guaranty Trust Company for assistance in the continuing negotiations. Mr. Leo testified that the function of Morgan Guaranty was to take the place of Chan and to get an actual accounting of the value of the second stage. In spite of the foregoing, Radick sent a letter to Mr. Leo on November 14 which stated "it is our clear understanding that you and your associates no longer have any interest in purchasing the Deak assets covered [in] the Stock Purchase Agreement other than the FOCO shares." The letter further stated: "this will advise you of our intention to represent Chan Cher Boon in respect of the remaining transactions contemplated by the Stock Purchase Agreement."

Eckerman responded on November 18 by a letter advising that "your statement of our position is not consistent with what we told you by telephone." The letter stated that Mrs. Leo intended to honor the Stock Purchase Agreement but was silent on her intent to bid or pay more for the second stage assets. And the letter stated: "with regard to your intention to represent Mr. Chan Cher Boon we would like to remind you of your November letter to us in which you state that you will not represent either [Chan or Mrs. Leo] without the written consent of the other. We have never given consent for you to act for Mr. Chan Cher Boon since your November 1 letter and do not intend to do so." The letter advised Milbank that Morgan Guaranty Trust was now acting as agent for Mrs. Leo.

*Milbank represents Chan*

When the Leos learned that Milbank had appeared on behalf of Chan in a Chapter 11 hearing on November 19 without the consent of Mrs. Leo, Eckerman wrote a letter objecting to this action and stating that "[y]ou are now acting for Mr. Chan Cher Boon against the interest of the person you knew was the real party in interest in connection with the July 5, Agreement." Milbank continued to represent Chan in spite of this letter and now argues to the court that it was free to do so because Mrs. Leo was not "actively pursuing" the assets. However, Mrs. Leo had a contract with Deak to acquire all of the assets and would do so unless some competitive bid appeared to oust her position on the second stage assets. Because Deak could not solicit competing bidders, the Leos could hope to acquire the assets for no further expenditure beyond the money in escrow. Chan, assisted by Milbank, prevented that very thing from happening.

An order to show cause from the bankruptcy court dated December 12 gave notice to the Leos that Chan, assisted by Milbank, was about to proceed with a purchase of the second stage assets. The order notified the Leos of a bankruptcy court hearing scheduled for December 23 which was to approve a "proposed amendment" to the stock purchase agreement. The Leos understood that the "proposed amendment" allowed Chan to use Mrs. Leo's $8.5 million in escrow for Chan's own purchase of the second stage assets. Chan was proposing to continue his own position as the original purchaser; there was no new proposal from new investors. Chan

agreed to increase "his" total offer for the Deak assets from $52 million to $58 million. The proposed agreement gave no hint that Chan had ceased to act as nominee for Mrs. Leo, and it directed that the money held in escrow was to be released and paid to Deak.

Milbank attempts to justify the "proposed amendment" by explaining that Chan was preparing to replace the escrow funds. Chan did enter into a tentative letter of agreement with a new financier of the second stage assets for replacing the $8.5 million. That agreement fell through on December 23 when the investors stated they could not get the money in time. The Leos testified that Milbank never informed the bankruptcy court or them of the intention to replace the escrow money and to obtain full financing for Chan. Furthermore, there was nothing to this effect in the proposed amendment of the stock purchase agreement.

Because of this apparent attempt to use the $8.5 million in escrow, the Leos retained different New York attorneys and obtained a temporary restraining order preventing Chan from using that money. On the other front, the creditors' committee in the Deak bankruptcy was threatening to sue Mrs. Leo if she prevented their proposed deal with Chan from going through. Mrs. Leo settled the New York litigation with Chan by obtaining the return of the $8.5 million and allowing Chan to close for the Deak second stage assets without prejudice, however, to the Leos later pursuing their claims pursuant to the July 5 agreement. Mrs. Leo stood on the original agreement and did not try to out-bid Chan for the second stage assets. The second stage assets were sold to Chan for approximately $10.5 million.

Nine months after the completion of the sale, Milbank commenced an action against Chan for collection of legal fees incurred in the Deak transaction. Chan filed a third party complaint against Mrs. Leo and Wen for indemnification. Mrs. Leo asserted counterclaims against Chan and cross claims against Milbank.

In the cross-claim trial the jury found that an attorney client relationship existed between Mrs. Leo and Milbank, that Milbank then represented a party with interests ma-terially adverse to Mrs. Leo in the same transaction, that Milbank had breached its fiduciary duties to Mrs. Leo, and that the breach was a substantial factor in her failure to complete the second stage of the transaction. They awarded $2 million in damages.

## DISCUSSION

### A.

 Milbank asserts that the district court erred by denying its motion for judgment after trial pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. A motion for judgment notwithstanding the verdict should be denied unless the jury reached a verdict reasonable jurors could not have reached. *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993). It is improper to grant a j.n.o.v. unless there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture...." *Id.* (quoting *Mattivi v. South African Marine Corp., "Huguenot,"* 618 F.2d 163, 168 (2d Cir.1980)). Although "judgment as a matter of law" now encompasses pre-verdict and post-verdict motions, the standard for granting what used to be known under Rule 50 as a j.n.o.v. has not changed. *Samuels,* 992 F.2d at 14.

Milbank first claims that even if it did breach a duty owed Mrs. Leo, no harm was caused to her, because no evidence sustains the jury's determination that Milbank's representation of Chan impeded Mrs. Leo from acquiring the second stage assets. Milbank contends that its actions caused no harm to Mrs. Leo because she would not have been able to acquire the assets without bidding on them, and this she failed to do by her own choice. The fact remains, however, that the original agreement conditionally entitled Mrs. Leo to all of the assets, and she was prevented from obtaining the second stage assets by her former agent, assisted by her former attorney, and apparently with the attempted use of her own $8.5 million.

A fiduciary unsuccessfully advanced a similar causation argument in *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988,

995–96 (2d Cir.1983). In *ABKCO,* certain business affairs of the Beatles, including those of George Harrison and Harrison Interests, had been handled by ABKCO and Allen Klein, the president of ABKCO. Harrison Interests claimed that Klein later interfered with settlement negotiations between Harrison Interests and another company in a dispute. The district court found that Klein's status as former business manager added special credibility to the advice and information that he gave to the hostile company, making it less willing to settle with Harrison Interests. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 508 F.Supp. 798, 803 (S.D.N.Y.1981). Although it was unclear whether Harrison Interests would have settled with the company without ABKCO's interference, Klein's intrusion made the settlement less likely. *Id.*

On appeal ABKCO argued, in part, that there was no causal relationship between its actions and Harrison Interests' failure to obtain settlement. We disagreed and affirmed, reasoning that "[a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *ABKCO,* 722 F.2d at 995–96. Having found that ABKCO's conduct constituted a breach of fiduciary duty, "the district judge was not required to find a 'but for' relationship between ABKCO's conduct and lack of success of Harrison Interests' settlement efforts." *Id.* at 996.

Although we stated in *ABKCO* that the facts of that case were "novel" and unique, we indicated that the situation was similar, "although not wholly analogous" to side-switching cases involving attorneys and their former clients. *Id.* at 995. There is an even more compelling reason to apply a prophylactic rule to remove the incentive to breach when the fiduciary relationship is that of an attorney and former client because of the attorney's unique position of trust and confidence. Furthermore, breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages. *See Northwestern Nat. Ins. Co. v. Alberts,* 769 F.Supp. 498, 506 (S.D.N.Y.1991)

("[A] plaintiff alleging breach of fiduciary duty ... is not required to meet the higher standard of loss or proximate causation."); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992) (a third party participating in a fiduciary's breach need not profit from the breach and liability may attach for acts or omissions that are a "substantial factor" in the sequence of causation); *Zackiva Communications Corp. v. Horowitz,* 826 F.Supp. 86, 88 (S.D.N.Y.1993) (to state a claim for a breach of fiduciary duty, "a plaintiff need not allege damages to itself"); *Diamond v. Oreamuno,* 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 81, 248 N.E.2d 910, 912 (1969) (a corporate fiduciary entrusted with information may not appropriate that asset for his own use even if he causes no injury to the corporation).

■ Milbank promised in writing not to represent Chan or Mrs. Leo after Chan's agency was terminated. Milbank then turned around, without consent, to pursue on behalf of Chan an amendment to the same transaction that it had previously negotiated on behalf of Mrs. Leo. This conduct was more serious than the case where an attorney later represents a party with interests adverse to a former client in a similar yet wholly new transaction. This constitutes a serious breach of fiduciary duty where a "prophylactic rule" should apply; Mrs. Leo does not have to show strict "but for" causation or proximate cause. *See also Alberts,* 769 F.Supp. at 506. She has to show that Milbank's representation of Chan was at least a substantial factor in preventing her from acquiring the second stage assets. *See Spector v. Mermelstein,* 485 F.2d 474, 480 (2d Cir.1973). Milbank cannot enjoy impunity by showing that Mrs. Leo's losses *might* have resulted from other possible causes. *Id.*

■ The jury could have reasonably inferred from the evidence that Milbank's representation of Chan was a substantial factor in preventing Mrs. Leo from acquiring the second stage assets. Similar to *ABKCO,* the jury could have found that Milbank's presence gave Chan added credibility, which could have been critical to his success in completing the transaction. This is especial-

ly true where Milbank and Chan were the ones who had negotiated the stock transaction from the beginning. The jury could have decided that, by taking advantage of their prior position and Mrs. Leo's escrow funds, Milbank and Chan substantially enhanced their prospects during the November and December negotiations with Deak. The jury could have concluded that the second stage was ultimately completed because Milbank improperly negotiated the deal on behalf of Chan using Mrs. Leo's $8.5 million, regardless of whether or not someone actually intended to replace the money at some point. Furthermore, this conduct on the part of Milbank interfered with Mrs. Leo's negotiating posture, because (a) she was more concerned with protecting the $8.5 million and avoiding a threatened lawsuit by the creditors' committee than she was with staying abreast of the maneuvers of Chan, (b) because she was not sure the $8.5 million would be available to close a transaction on her behalf, and (c) because she was deprived of the tactical option of offering the Deak creditors' committee the $8.5 million on a take-it-or-leave-it basis before Chan could demonstrate plausible independent financial capacity.

Milbank argues that Mrs. Leo could not have completed the transaction through the bankruptcy court, because the liquidation value of the second stage assets was greater than her proffered bid. But it is not accurate to say that the change in value of the Swiss franc meant that the bankruptcy estate would get nothing for the second stage. The first stage was completed, and the $8.5 million held in escrow would either be returned to the Leos if the second stage was not completed in their favor, or would go to the bankruptcy estate if there were no other bidders. The jury could have concluded that Mrs. Leo was willing to offer slightly more than the amount of money in escrow, or at least enter into further negotiations, even though she was not willing or able to outbid Chan. There is no conclusive evidence in the record pointing to the liquidation value of the second stage assets. We cannot surmise on review what these assets were worth and what the bankruptcy court would or would not have approved.

We need not and cannot determine whether or not Mrs. Leo would have successfully completed the transaction without Milbank's conduct against her interests. The most likely view of the evidence taken by the jury was that Milbank made the deal possible for Chan, and that otherwise, Mrs. Leo would have obtained the second stage assets for the $8.5 million. If the value of the assets was the $10.5 million that was paid by Chan, the difference would be the $2 million that was awarded in the verdict.

## B.

The jury found that Milbank used confidential information from Mrs. Leo in connection with the representation of Chan. Whether or not that particular finding was essential to the judgment, Milbank errs in its argument that there was no evidence to support the finding. Milbank obtained significant information by Mr. Leo's statement to Milbank partner Radick in early November that the Leos were still interested in acquiring the second stage assets but were not willing to increase their bid until they received further information on the value of those assets. That cleared the path for Chan, at least for the immediate time. Milbank claims that it gained that knowledge after their attorney-client relationship ended on October 28. But, October 28 was the date when Eckerman notified Milbank that Chan was no longer authorized to act on behalf of the Leos; the relationship did not end until November 14th when Radick sent a letter to Mr. Leo stating that Milbank would no longer act on behalf of the Leos in the stock purchase agreement. The letter explained that this decision was based on "advice given during our telephone conversation."

## C.

We reject Milbank's argument that the judge's decision not to grant a new trial was an abuse of discretion because it was based solely on judicial economy. The judge may have indicated his disagreement with the jury's verdict, but he clearly decided that there had been a fair trial where "everybody had their best crack to do their best to

decide what arguments they wanted to present and not to present." The judge deferred to the jury's verdict as one that jurors could reasonably reach and properly denied the motion for new trial.

### D.

Milbank's objections to the court's instruction to the jury on the essential elements of an agency relationship are also rejected. The jury heard uncontested evidence that Chan signed a document which was requested by the Leos' attorney and notarized by a Milbank attorney, specifically stating that Chan was acting on behalf of Mrs. Leo in negotiating the transaction. The jury was told by the court that it was necessary for them to find that Chan was acting at that time at the behest of Mrs. Leo, which finding the jury must have necessarily made.

There being no error, the judgment of the district court is affirmed.

AFFIRMED.