[710 NYS2d 578]

CHARLES F. GIBBS et al., Appellants, v BREED, ABBOTT & MORGAN et al., Respondents.

First Department, July 13, 2000

### APPEARANCES OF COUNSEL

*Leslie D. Corwin* of counsel (*Simon Miller* on the brief; *Greenberg Taurig,* attorneys), for appellants.

*Paul R. Grand* of counsel (*Diana D. Parker* and *Tracy E. Lehman* on the brief; *Morvillo, Abramowitz, Grand, Iason & Silberberg, P. C.,* attorneys), for respondents.

### OPINION OF THE COURT

MAZZARELLI, J.

Plaintiffs Charles Gibbs and Robert Sheehan are former partners of Breed, Abbott & Morgan (BAM) who specialize in trust and estate law. They withdrew from BAM in July 1991 to join Chadbourne & Parke (Chadbourne), and brought this action for monies due to them under their BAM partnership

agreement. Defendants asserted various counterclaims alleging that plaintiffs breached their fiduciary duty to BAM. The counterclaims were severed and tried without a jury. Plaintiffs appeal from the trial court's determination that, in the course of both partners' planning and eventually implementing their withdrawal from BAM, they breached their fiduciary duty to the partnership. Plaintiffs also appeal from the trial court's determination that $1,861,045 in damages resulted from these transgressions.

From January 1991 until July 1991, plaintiffs were the only partners in the trusts and estates department (T/E) at BAM; plaintiff Gibbs was the head of the department. A third partner, Paul Lambert, had been the former head of the department, and he had obtained many, if not most, of the department's clients. In 1989 he had left the firm to become the United States Ambassador to Ecuador and was still on leave in 1991. Lambert intended to return to the firm upon completion of his term as ambassador. The BAM trusts and estates department also employed three associate attorneys, Warren Whitaker (fifteenth year), Austin Wilkie (fourth year), and Joseph Scorese (first year); two accountants, Lois Wetzel and Ellen Furst; and two paralegals, Lee Ann Riley and Ruth Kramer.

Gibbs had become dissatisfied with BAM, and in January 1991 he began interviews to locate a new affiliation. He also approached Sheehan to persuade him to move with him. Sheehan and Gibbs subsequently conducted a number of joint interviews with prospective employers. In May 1991, Ambassador Lambert visited BAM, and Gibbs told him that he had been interviewing. Lambert relayed this information to the other partners. In early June, plaintiffs informed the executive committee that they had received an offer from two firms: McDermott, Will & Emory and Bryan Cave.

On June 19, 1991, both plaintiffs informed Stephen Lang, BAM's presiding partner, that they had accepted offers to join Chadbourne. Lang asked Gibbs not to discuss his departure with any of the T/E associates, and Gibbs agreed not to do so. On June 20, 1991, Lawrence Warble, a BAM partner who was named temporary head of the T/E department, met with its associates and nonlegal personnel to inform them that plaintiffs were leaving the firm.

On June 24, 1991, Gibbs and Sheehan sent Chadbourne a memo listing the names of the personnel in the T/E department at BAM, their respective salaries, their annual billable hours, and the rate at which BAM billed out these employees

to clients. The memo included other information about the attorneys, including the colleges and law schools they attended and their Bar admissions. This list had been prepared by Sheehan on April 26, 1991, months before the partners announced they were leaving. Sheehan specifically testified that the memo was prepared in anticipation of discussions with prospective firms, and both Gibbs and Sheehan testified at trial that the recruitment of certain associates and support personnel was discussed with different firms between March and May, as the partners were considering various affiliations. While Gibbs and Sheehan were still partners at BAM, Chadbourne interviewed four BAM employees that Gibbs had indicated he was interested in bringing to Chadbourne with him. On June 27, 1991, plaintiffs submitted their written resignations. Before Gibbs and Sheehan left BAM, they wrote letters to clients served by them, advising that they were leaving BAM and that other attorneys at BAM could serve them. These letters did not mention the fact that the two partners were moving to Chadbourne. Although the partnership agreement required 45 days' notice of an intention to withdraw, BAM waived this provision upon plaintiffs' production of their final billings for work previously performed.[1] Gibbs left BAM on July 9, 1991, and Sheehan left on July 11, 1991, both taking various documents, including their respective "chronology" or desk files.[2] With the assistance of his chronology file, Gibbs began to contact his former clients on July 11, 1991. On July 11th, Chadbourne made employment offers to Whitaker, Wilkie, Wetzel, and Riley. Wilkie, Wetzel, and Riley accepted that same day; Whitaker accepted on July 15, 1991. In the following weeks, 92 of the 201 BAM T/E clients moved their business to Chadbourne.

After hearing all the testimony and the parties' arguments, the trial court determined that Gibbs' actions in persuading his partner Sheehan to leave BAM, "and the way in which the

[1]. BAM did not attempt to prepare a joint letter with Gibbs and Sheehan, announcing their departure, as recommended by the American Bar Association (ABA) Committee on Ethics and Professional Responsibility (see, ABA Comm on Ethics and Professional Responsibility Inf Opn 1457 [1980]).

[2]. The "chronology" or desk files contained copies of every letter written by the respective attorneys during the previous years. The letters included those written to adversaries about pending legal matters, letters written to clients, and letters written to others about ongoing BAM matters. These letters were duplicates of those kept in BAM's regular client files, but defendants allege that due to the fact that the files are arranged chronologically, active matters are more easily referenced. The original correspondences, left with the firm, have been filed by client and are dispersed throughout the department.

leave was orchestrated, were done, at least partially, with the intention of crippling BAM's trusts and estates (T/E) department," (181 Misc 2d 346, 348) and constituted a breach of loyalty to BAM. The court also found that Gibbs and Sheehan had breached their fiduciary duties to BAM by sending Chadbourne the April 26, 1991 memo detailing personal information about the individuals in the T/E department at BAM, because this gave Chadbourne a competitive advantage in offering employment to other members of the department. Finally, the court found that Gibbs and Sheehan breached their fiduciary duties to BAM by taking their chronology files with them to Chadbourne. Specifically, the court concluded that by taking their respective chronology files, the partners "to a large degree hobbled their former partners in their effort to rebuild the Trusts and Estates department, in order to maintain a viable department, and in their ability to serve clients without undue disruption."

With respect to damages, the court concluded that both Gibbs and Sheehan were entitled to recover their share of BAM profits accruing until the end of July 1991, and that Sheehan was entitled to the remainder of his capital account with the firm. Although there was no evidence that the partners had improperly solicited former BAM clients, the court found that despite BAM's efforts to mitigate damages by hiring a new partner and two associates into the T/E department, that department suffered financial losses as a result of plaintiffs' conduct, and concluded that it was entitled to recover lost profits for a reasonable period following plaintiffs' departure. The court directed that lost profits be calculated from July 1991, when the partners left the firm, to November 1993, when BAM dissolved. Gibbs and Sheehan were held jointly and severally liable for $1,861,045. The court also awarded defendants prejudgment interest and attorneys' fees. The court's liability finding should be modified, the damage award vacated, and the matter remanded for a determination of the financial loss, if any, occasioned by plaintiffs' disloyal act of supplying competitors with BAM's confidential employee data.

■ The members of a partnership owe each other a duty of loyalty and good faith, and "[a]s a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain" (*Meehan v Shaughnessy*, 404 Mass 419, 434, 535 NE2d 1255, 1263). Partners are constrained by such duties throughout the life of the partnership and "[t]he manner in which partners plan for and implement withdraw-

als * * * is [still] subject to the constraints imposed on them by virtue of their status as fiduciaries" (Hillman, *Loyalty in the Firm: A Statement of General Principles on the Duties of Partners Withdrawing from Law Firms*, 55 Wash & Lee L Rev 997, 999 [1998]). According the trial court's findings on issues of fact and credibility appropriate deference, we uphold that portion of the court's liability determination which found that plaintiffs breached their fiduciary duty as partners of the firm they were about to leave by supplying confidential employee information to Chadbourne while still partners at BAM (*see, Graubard Mollen Dannett & Horowitz v Moskovitz*, 86 NY2d 112, 120-121). However, we find no breach with respect to Gibbs' interactions with Sheehan, or with respect to either partner's removal of his desk files from BAM.

Defendants did not establish that Gibbs breached any duty to BAM by discussing with Sheehan a joint move to another firm, or that Sheehan's decision was based upon anything other than his own personal interests. In addition, while in certain situations "[A] lawyer's removal or copying, without the firm's consent, of materials from a law firm that do not belong to the lawyer, that are the property of the law firm, and that are intended by the lawyer to be used in his new affiliation, could constitute dishonesty, which is professional misconduct under [Model] Rule 8.4 (c)" (DC Bar Legal Ethics Comm Opn 273, at 192), here, the partners took their desk copies of recent correspondence with the good faith belief that they were entitled to do so.

Contrary to the finding of the trial court, and applying the principle that "[t]he distinction between motive and process is critical to a realistic application of fiduciary duties" (Hillman, *op. cit.*, at 999), we find no breach of duty in plaintiffs taking their desk files. These were comprised of duplicates of material maintained in individual client files, the partnership agreement was silent as to these documents, and removal was apparently common practice for departing attorneys (*compare, Graubard Mollen Dannett & Horowitz v Moskovitz, supra,* at 121 ["abandoning the firm on short notice (taking clients and files) would not be consistent with a partner's fiduciary duties"]; *Kaufman v International Bus. Machs. Corp.*, 97 AD2d 925, *affd* 61 NY2d 930 [employee who had been working with trade secrets and had signed an agreement that his files belonged to his employer denied injunction barring firm from keeping certain documents from him upon his termination]; *Matter of Cupples*, 952 SW2d 226 [attorney committed professional

misconduct by secreting client litigation files from his partners and appropriating cases to himself in preparation for withdrawal]).

However, the record supports the court's finding that both partners committed a breach of their fiduciary duty to the BAM partners by supplying Chadbourne, and presumably the other partnerships they considered joining, with the April 26, 1991 memorandum describing the members of BAM's T/E department, their salaries, and other confidential information, such as billing rates and average billable hours, taken from personnel files. Moreover, a closer examination of the record does not support the dissent's conclusion that these partners did not engage in surreptitious recruiting. The partners may not have discussed with firm employees the possibility of moving with them prior to June 20, 1991, but they indicated to Chadbourne the employees they were interested in prior to this date, and Gibbs specifically testified that he refrained from telling one of his partners, to whom he had a duty of loyalty, about his future plans to recruit specific associates and support staff from the partnership.

There is no evidence of improper client solicitation in this case, nor is it an issue on this appeal. Although the analogy could be useful in concluding that Gibbs did not breach his fiduciary duty to the partnership by working with Sheehan to find a new affiliation, the fiduciary restraints upon a partner with respect to client solicitation are not analogous to those applicable to employee recruitment. By contrast to the lawyer-client relationship, a partner does not have a fiduciary duty to the employees of a firm which would limit his duty of loyalty to the partnership. Thus, recruitment of firm employees has been viewed as distinct and "permissible on a more limited basis than * * * solicitation of clients" (Hillman, *op. cit.,* at 1031). Prewithdrawal recruitment is generally allowed "only after the firm has been given notice of the lawyer's intention to withdraw" (*ibid.*).

However, here Sheehan prepared a memo in April of 1991, well in advance of even deciding, much less informing his partners of his intention to withdraw. There is ample support in the record for the trial court's finding that the preparation and sending of the April 26, 1991 memo, combined with the subsequent hiring of certain trusts and estates personnel, constituted an egregious breach of plaintiff's fiduciary duty to BAM. Moreover, it is not speculative to infer more widespread dissemination given Sheehan's trial testimony that the memo

"was prepared in connection with talking to other firms," and that "he was sure the subject of staffing was discussed at firms other than Chadbourne." Sheehan's disclosure of confidential BAM data to even one firm was a direct breach of his duty of loyalty to his partners. Because the memo gave Chadbourne confidential BAM employment data as well as other information reflecting BAM's valuation of each employee, Chadbourne was made privy to information calculated to give it an unfair advantage in recruiting certain employees (*see, Bancroft-Whitney Co. v Glen*, 64 Cal 2d 327, 411 P2d 921 [breach of fiduciary duty for corporate officer to surreptitiously provide competitor with selective list of qualified employees and their salaries]).

While partners may not be restrained from inviting qualified personnel to change firms with them (*see, Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 382 [striking down provision which would restrain partner from competing with his former firm], citing *Jacob v Norris, McLaughlin & Marcus*, 128 NJ 10, 607 A2d 142 [striking down provision which would prohibit partner from soliciting firm employees for a year after leaving the firm]), here Gibbs and Sheehan began their recruiting while still members of the firm and prior to serving notice of their intent to withdraw. They did so without informing their partners that they were disseminating confidential firm data to competitors. Their actions, while still members of the firm, were intended to and did place BAM in the position of not knowing which of their employees were targets and what steps would be appropriate for them to take in order to retain these critical employees. The dissent's analysis, that once the firm was notified of the partners' departure, there was no breach of fiduciary duty, is flawed. The breach occurred in April of 1991 and could not be cured by any after-the-fact notification by the fiduciary who committed the breach that he was withdrawing from the firm. Chadbourne still had the unfair advantage of the confidential information from the April 1991 memo, and still had the upper hand, which was manifested by its ability to tailor its offers and incentives to the BAM recruits.

Contrary to the dissent, I would characterize the memo distributed to prospective competitors as confidential. The data was obtained from BAM personnel files which Sheehan had unique access to as a BAM partner. The dissent's statement that such financial information is generally known to "headhunters" is without foundation. While the broad outlines of the partners' profits at a select number of large New York firms

and the incremental increases in the base compensation of young associates at some firms are published in professional publications such as the New York Law Journal, or known to some recruitment firms, the available figures often vary substantially from the actual compensation received by specific individuals.

For example, the BAM partnership agreement, which is included in the record, reveals that the approximately 40 partners in the firm earn substantially different percentages of the firm's earnings. No professional publication would be privy to these financials. With respect to the specific associates and support staff whose compensation was disseminated in the April 1991 memo, the information disclosed to Chadbourne incorporated these individuals' bonuses. Bonus payments are confidential, often voted by the partnership, based upon the unique quality of an individual's work, the number of hours billed, and many other intangible factors. These lump-sum payments often constitute a substantial portion of an associate's salary, and the payments are certainly not available to the public. Finally, support staff also receive bonuses paid to them at the discretion of the individual partners, from their personal accounts. This information is highly individualized and also privileged. Sheehan abused his fiduciary duty to the partnership by accessing personnel files to obtain the actual gross compensation of the associates and support staff he and Gibbs wished to bring with them, including bonuses, and disclosing this information to Chadbourne.

Moreover, the memo contained more than a list of salaries. It itemized each of the employee's annual billable hours, and the rates at which BAM billed these employees out to their clients, information which was not otherwise publically available. These facts go directly to a potential employee's value and were accessible only to members of the BAM partnership. Selected partners providing BAM's confidential information, which they were able to obtain by virtue of their position as fiduciaries, to Chadbourne was an act of disloyalty to their partnership. The confidential information placed Chadbourne, as a competing prospective employer, in the advantageous position of conducting interviews of the associates and support staff with more knowledge than any firm could obtain through independent research, as well as providing it with information BAM partners did not know it had, thereby prejudicing their own efforts to retain their associates and support staff.

■ The calculation of damages in cases such as this is difficult. "[B]reaches of a fiduciary relationship in any context

comprise a special breed of cases that often loosen normally stringent requirements of causation and damages" (*Milbank, Tweed, Hadley & McCloy v Chan Cher Boon*, 13 F3d 537, 543 [2d Cir 1994]; *see, Wolf v Rand*, 258 AD2d 401). This is because the purpose of this type of action "is not merely to *compensate* the plaintiff for wrongs committed * * * [but also] 'to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates' " (*Diamond v Oreamuno*, 24 NY2d 494, 498 [emphasis in original], quoting *Dutton v Willner*, 52 NY 312, 319). However, the proponent of a claim for a breach of fiduciary duty must, at a minimum, establish that the offending parties' actions were "a substantial factor" in causing an identifiable loss (*Millbank, Tweed, Hadley & McCloy v Chan Cher Boon, supra*, at 543; *see, 105 E. Second St. Assocs. v Bobrow*, 175 AD2d 746 [awarding amount of loss sustained by reason of the faithless fiduciary's conduct]).

A reasonable assessment of lost profits has been deemed an appropriate measure of damages in cases where there was evidence that the fiduciary improperly solicited clients to move with him or her (*see, Meehan v Shaughnessy, supra*, 404 Mass, at 435, 535 NE2d, at 1264), or where the fiduciary's acts could otherwise be connected to a subsequent loss of business (*see, Duane Jones Co. v Burke*, 306 NY 172, 192; *Bruno Co. v Friedberg*, 21 AD2d 336, 341; *see also, Wolf v Rand, supra,* at 402 [lost profits awarded where defendants in closely held corporation misappropriated company profits to themselves]). Here, the court based its damage award on what it believed to be a series of disloyal acts. Defendants did not establish how the only act of plaintiffs which this Court finds to be disloyal, that of supplying employee information to Chadbourne, in and of itself, was a substantial cause of BAM's lost profits (*see, Stoeckel v Block*, 170 AD2d 417 [no demonstration that the decline in defendant's business was attributable to plaintiffs' alleged wrongful conduct during the term of their employment]). We therefore vacate the court's award to defendants of the total profits lost by BAM between the time of plaintiffs' departure in July 1991 and BAM's dissolution in November 1993, and remand for consideration of the issue of whether plaintiffs' disloyal act of sending Chadbourne the April 26, 1991 memorandum was a significant cause of any identifiable loss, and, if so, the amount of such loss.

Accordingly, the order, Supreme Court, New York County (Herman Cahn, J.), entered October 1, 1998, which, after a

nonjury trial on defendants' counterclaims, determined that plaintiffs had breached their fiduciary duty to defendants, should be modified, on the law, to limit such conclusion to the act of disseminating confidential employee information, and otherwise affirmed, without costs. Order, same court and Justice, entered on or about June 29, 1999, which, to the extent appealed from as limited by the parties' briefs, directed that defendants shall recover $1,861,045, plus prejudgment interest, on their counterclaims, should be reversed, on the law, without costs, the damage award vacated, and the matter remanded for recalculation of damages in accordance with this Opinion.

SAXE, J. (concurring in part and dissenting in part). Much has been written about the ethical and fiduciary obligations of attorneys upon withdrawal from their law firms, particularly with regard to their solicitation of firm clients (*see, e.g., Graubard Mollen Dannett & Horowitz v Moskovitz*, 86 NY2d 112; Hillman, *Law Firms and Their Partners: The Law and Ethics of Grabbing and Leaving*, 67 Tex L Rev 1; Johnson, *Solicitation of Law Firm Clients by Departing Partners and Associates: Tort, Fiduciary, and Disciplinary Liability*, 50 U Pitt L Rev 1). However, rather than involving the improper solicitation of former clients, this case concerns claims of wrongful "solicitation" or "taking" of a withdrawing attorney's own partners, associates, and support staff. We are also required to address the propriety of departing attorneys removing the duplicate copies of letters and memos in their possession that they personally prepared and issued over the preceding years, which plaintiffs term "desk chronology files" or "correspondence chronology files."

In view of the limited case authorities directly on point, resolution of this appeal requires a review of the general principles concerning client solicitation and attorneys' covenants not to compete, as well as the general policy considerations discussed in numerous scholarly articles concerning the competing interests in law firm breakups. The trial court's liability determination runs counter to these principles and policies and it is not supported by the evidence. Therefore, I would reverse the judgment in its entirety. To the extent the majority affirms one aspect of the liability determination, I dissent. As to the remainder of the majority opinion, I concur in the result, based upon the following discussion.

This lawsuit concerns the 1991 move of the core of the trusts and estates department of Breed, Abbott & Morgan (Breed,

Abbott) to Chadbourne & Parke (Chadbourne). According to the findings of the trial court, plaintiff Charles Gibbs, a partner in the trusts and estates department of Breed, Abbott, began making inquiries into joining another firm, and spoke with his colleague in the trusts and estates department, plaintiff Robert Sheehan, about the possibility of their moving as a team, ultimately convincing him. Once plaintiffs accepted offers to join Chadbourne, they notified Breed, Abbott. A few days later they provided Chadbourne with a list of four out of the seven associates and support personnel remaining in Breed, Abbott's trusts and estates department, containing salary information that Sheehan had compiled a few months earlier. Shortly after Gibbs and Sheehan left Breed, Abbott, Chadbourne made employment offers to those four employees: two of the department's three associates, one of its two paralegals and one of its two accountants; all of them accepted the offers. Finally, upon leaving Breed, Abbott, plaintiffs took with them their "desk chronology files" or "correspondence chronology files," containing duplicate copies of their memos and correspondence from the previous years, although the firm's copies of this correspondence remained with the firm, filed in the appropriate client files.

The trial court concluded that plaintiffs breached their fiduciary duty to their former partners in several ways. First, that plaintiff Charles Gibbs improperly "solicited" his partner Robert Sheehan to leave Breed, Abbott with him; second, that it was improper for the two attorneys to take their chronological correspondence files with them; lastly, that the plaintiffs furnished to their new law firm, prior to their departure from Breed, Abbott, confidential information regarding their support staff, whom Chadbourne then hired. The trial court also explicitly found that plaintiffs' move to Chadbourne & Parke was "orchestrated to cripple" Breed, Abbott.

The evidence before the trial court fails to support its findings that plaintiffs violated their fiduciary duty to their partners at Breed, Abbott. I agree with the majority's holding that Gibbs's predeparture discussions with Sheehan cannot constitute a breach of Gibbs's fiduciary duty to Breed, Abbott, and that plaintiffs' removal of their desk chronology files breached no obligation to their former partners. However, I disagree with the conclusion that defendants are entitled to damages based upon plaintiffs having provided Chadbourne with information about other employees of the firm's trusts and estates department, which information was provided in

the interests of bringing these employees along with them in their move to Chadbourne.

Persuading a Partner to Leave the Firm as a Team

Turning first to the trial court's finding that Gibbs "actively encouraged" or "persuaded" Sheehan to leave the firm with him, and "orchestrated" their move to cripple Breed, Abbott's trusts and estates department, there is no established fiduciary duty that can be stretched to cover Gibbs's conduct. The standard employed by the trial court, if applied generally, would too severely restrict attorneys' rights to change affiliations, compete with former partners, and offer clients full freedom of choice with respect to retaining counsel.

Initially, the "solicitation" of one's own partners to make a joint move simply does not qualify as a breach of fiduciary duty. Indeed, *Graubard Mollen Dannett & Horowitz v Moskovitz* (86 NY2d 112, *supra*), which actually involved a joint move by several partners, only discussed a breach of fiduciary duty regarding the solicitation of firm clients.

In *Graubard Mollen (supra)*, defendant senior partner Irving Moskovitz, along with two other partners from his department, left plaintiff law firm and joined another firm, LeBoeuf Lamb Leiby & MacCrae. Prior to announcing their departure, the senior partner had arranged meetings between members of LeBoeuf and a major client, F. Hoffman LaRoche & Co., Ltd. (Roche); allegedly, LeBoeuf would not finalize any arrangement with Moskovitz and the colleagues going with him, unless Roche agreed to transfer its business to go along with defendants' move.

In affirming a denial of Moskovitz's motion for summary judgment, the Court of Appeals articulated certain basic principles regarding which conduct is clearly proper and which is clearly improper in withdrawing from a law firm. The Court recognized that an attorney's fiduciary duty is not violated by "taking steps to locate alternative space and affiliations" (*Graubard Mollen Dannett & Horowitz v Moskovitz, supra,* at 120). The Court also noted that "departing partners have been permitted to inform firm clients with whom they have a prior professional relationship about their impending withdrawal and new practice, and to remind the client of its freedom to retain counsel of its choice [citations omitted]," although it added that "[i]deally, such approaches would take place only after notice to the firm of the partner's plans to leave [citations omitted]" (*supra*, at 120).

Among the clearly improper conduct identified by the Court as "[a]t the other end of the spectrum" was "attempting to lure

firm clients (even those the partner has brought into the firm and personally represented) to the new association" (*supra,* at 120). "[A]s a matter of principle, preresignation surreptitious 'solicitation' of firm clients for a partner's personal gain * * * exceeds what is necessary to protect the important value of client freedom of choice in legal representation, and thoroughly undermines another important value—the loyalty owed partners" (*supra,* at 119-120).

The "solicitation" of one's own partners to make a joint move is fundamentally different than the solicitation of firm clients; the analysis which concludes that surreptitious solicitation of clients or secreting client files is improper is irrelevant to partners' conduct toward one another. "Soliciting" another member of one's firm does not involve the same concerns.

Although clients are not, technically, an "asset" or "property" of the firm, subject to possession, the rules regarding their solicitation treat them as something of an equivalent (*see,* Hillman, *Loyalty in the Firm: A Statement of General Principles on the Duties of Partners Withdrawing from Law Firms,* 55 Wash & Lee L Rev 997, 1010 ["*Graubard* rests on the assumption * * * that clients 'belong to the firm' rather than its members * * * ignor[ing] the reality that clients are not 'assets' susceptible to ownership"]; *see also,* Hillman, *Law Firms and Their Partners: The Law and Ethics of Grabbing and Leaving,* 67 Tex L Rev 1, 29 [1988]; ABA Comm on Professional Ethics Formal Opn 300 [1961]). The wrongfulness in preresignation solicitation of clients lies in directly and unfairly competing with the firm for *business,* while still a partner of it, taking unfair advantage of knowledge the firm lacks.

While it is arguable whether clients should be treated, for purposes of this analysis, as assets of the firm, it is clear that partners in a law firm cannot be treated as such.

Law partners "are bound by a fiduciary duty requiring 'the punctilio of an honor the most sensitive'" (*Graubard Mollen Dannett & Horowitz v Moskovitz,* 86 NY2d 112, 118, *supra,* quoting *Meinhard v Salmon,* 249 NY 458, 464). Yet, neither this duty nor any rules of ethics prohibit partners in a law firm from leaving the firm, or from competing with their former firm immediately upon their departure, or even from making plans while still a member of the firm to compete with it following their departure (*see,* Hillman, *Loyalty in the Firm: A Statement of General Principles on the Duties of Partners Withdrawing from Law Firms,* 55 Wash & Lee L Rev 997, 1002 [1998]; *Meehan v Shaughnessy,* 404 Mass 419, 435, 535 NE2d

1255, 1264). What is prohibited is *actual* competition with the firm while still a member of it (*see*, Hillman, *Loyalty in the Firm*, *op cit.*, at 1010).

An over-all guiding principle limiting the conduct of departing partners is that the process must be handled properly and fairly (*see*, Johnson, *Solicitation of Law Firm Clients*, 50 U Pitt L Rev 1, 100-101, *op. cit.*), so that the withdrawing partner, while in possession of information that the firm lacks (namely, his impending departure), may not take unfair advantage of that information (*see*, Hillman, *Loyalty in the Firm*, *op. cit.*, at 1012; *Meehan v Shaughnessy*, *supra*, 404 Mass, at 441, 535 NE2d, at 1267). Thus, where a partner surreptitiously approaches firm clients to obtain assurances that the clients will remain with him if he forms a new law firm, the partner has breached his duty to his partners and his firm (*see*, *Graubard Mollen Dannett & Horowitz v Moskovitz*, *supra*, at 119; *Meehan v Shaughnessy*, 404 Mass 419, 435, 535 NE2d 1255, 1264, *supra*; *Kantor v Bernstein*, 225 AD2d 500). The prohibition against secretly soliciting clients, or removing client files, prior to one's resignation, is founded upon the prohibition against taking unfair advantage of the knowledge of his impending departure, while his partners are still unaware of it. It constitutes not a mere plan to compete in the future with his former law partners, but a present act of direct competition with those to whom he still owes a duty of loyalty.

An equally important principle in these circumstances, providing something of a counterweight to the duty of loyalty partners owe one another, is "the important value of client freedom of choice in legal representation" (*Graubard Mollen Dannett & Horowitz v Moskovitz*, 86 NY2d 112, 120, *supra*). Imposition of a limitation which restricts the ability of a departing partner to offer the client the ability to continue to serve as counsel may violate the ethical prohibition against restricting an attorney's practice of law (Code of Professional Responsibility DR 2-108 [a] [22 NYCRR 1200.13 (a)]; *see*, *Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375; *Cohen v Lord, Day & Lord*, 75 NY2d 95).

A partner planning a move necessarily makes numerous arrangements in anticipation of withdrawal, to ensure a smooth transition, including ensuring the capability of continuing to serve those former clients who choose to retain the departing partner (*see*, *Meehan v Shaughnessy*, *supra*, 404 Mass, at 435, 535 NE2d, at 1264). The same considerations apply equally when two partners plan a joint move (*see*, *e.g.*, *Meehan v*

*Shaughnessy, supra*). The fact that one partner conceived of the move first and approached the other with the idea, or even convinced an initially content colleague to embark upon a joint departure, cannot change the attorneys' right to leave their firm.

Nor is there is any evidence that Sheehan's decision to interview jointly with Gibbs or to leave Breed, Abbott was anything other than his own considered decision. The testimony that he felt "under pressure" from a number of sources does not alter the fundamental fact that he was always free to make that decision for himself. Merely approaching another partner, in order to broach and explore the subject of a joint move to another firm, even to attempt to convince him of the advantages of such a joint move, simply cannot serve as the foundation for liability to the firm.

Furthermore, should the two partners finally agree on a move, and ultimately arrive at an arrangement with another firm acceptable to both, the "orchestration" of the move cannot serve as a basis for liability in the absence of a type of sneaky or malicious conduct present in *Kantor v Bernstein* (225 AD2d 500, *supra*) and *Graubard Mollen Dannett & Horowitz v Moskovitz* (*supra*) but absent here.

The observation of the trial court that plaintiffs' joint departure "denuded" Breed, Abbott's trusts and estates department is irrelevant to the issue of breach of fiduciary duty. Where a department of a law firm contains two active partners, a few associates and support staff, a decision by the two partners to withdraw from the firm will of necessity "denude" the department, and may indeed even "cripple" it, at least temporarily. However, it does not follow that the departure violates the duty owed by the departing partners to the firm. Partners' freedom to withdraw from a firm simply cannot be reconciled with a requirement that their departure be arranged in such a way as to protect the integrity of the department, and ensure its continued profit levels.

Partners who choose to leave a firm and join another presumably believe they will do better at their new affiliation. We can thus assume that as a result of the withdrawal, the old firm may well be economically damaged. Yet, the mere fact of such damage does not make it compensable.

Associates and Other Staff

Once it is recognized that partners in law firms do not breach their duty to the other members of their firm by speaking to

colleagues about leaving the firm, there is no logic to prohibiting partners from inviting selected employees to apply for a position at the new firm as well, absent contractual obligations not at issue here. Support staff, like clients, are not the exclusive property of a firm with which they are affiliated.

Moreover, the paramount concern of ensuring that clients are completely free to choose which firm will best serve them (see, *Graubard Mollen Dannett & Horowitz v Moskovitz, supra,* at 120; *Meehan v Shaughnessy, supra,* 404 Mass, at 435, 535 NE2d, at 1264; *Pettingell v Morrison, Mahoney & Miller,* 426 Mass 253, 255, 687 NE2d 1237, 1238-1239) can only be protected if lawyers are able to take with them those willing members of their legal team who played an active and important role in the clients' work (see, Hillman, *Loyalty in the Firm, op. cit.,* at 1029-1030). If departing partners are not free to solicit the employees who have served their clients, those partners may not be able to continue to offer the unhampered capability to serve those clients (see, *Jacob v Norris, McLaughlin & Marcus,* 128 NJ 10, 30-31, 607 A2d 142, 153).

Even assuming that a partner's duty of loyalty to the other members of his firm prohibits any recruitment of department support staff *before* the firm is notified of the partner's intended departure (see, Hillman, *Loyalty in the Firm, op. cit.,* at 1031-1032), here, there is no showing that members of the staff were contacted prior to the firm being notified. Once the firm is notified of the partners' planned withdrawal, both the firm and the departing partners are on equal footing in competing for these employees; the departing partners no longer have any unfair advantage.

Since plaintiffs were entitled to inform the department staff at issue of their move, and to invite these individuals to submit applications to Chadbourne themselves, there was no impropriety in the manner in which Chadbourne extended offers to members of plaintiffs' staff. The real damage to the firm, namely, the loss of the knowledgeable and experienced attorneys and support staff, was caused not by a breach of fiduciary duty, but simply by the departure of these people—an act that each one of them had an absolute right to do, despite the damage their joint departure would cause the firm.

The April 26, 1991 Memo

Under the circumstances, plaintiffs' preliminary compilation of information regarding the salaries, billable hours and standard billing rates of the employees they sought to bring with them, and their providing it to Chadbourne after giving notice

to Breed, Abbott, provides no support for a liability determination against them.

First of all, there is no showing, nor did the trial court find, that the purportedly confidential information was provided to Chadbourne—or any other firm—during the period that plaintiffs were interviewing, or at any time before they gave notice to Breed, Abbott. The April 26, 1991 memo was simply a compilation of information of which a lead partner of a practice group is normally aware as a matter of course. Testimony that "the subject of staffing was discussed" during plaintiffs' interviews with firms—a discussion which we must presume will occur any time partners inquire into the possibility of changing firm affiliations—in no way establishes that the April 26, 1991 memo was turned over at that time. The suggestion of the majority that plaintiffs disseminated this information prior to giving notice to Breed, Abbott is speculation.

Furthermore, although the salaries and bonuses paid to associates may be termed "confidential," in fact this information is often the greatest unkept secret in the legal profession. Unlike the earnings of law firm partners, which vary widely even within most firms, depending upon such factors as billable hours and "rainmaking" ability, the earnings of associates and support staff at large firms are relatively circumscribed, with each firm setting standard rates for both salaries and bonuses. Such information is widely known outside the firms themselves: the salary levels and bonuses paid to associates at large New York firms are regularly published in professional publications such as the New York Law Journal. Salary levels, bonuses and other financial information regarding employees' billing rates are well known to professional "headhunters," the agencies that specialize in recruiting and placing lawyers and law firm support staff, and associates' background information is available from sources such as the Martindale-Hubbell directory.

Therefore, while plaintiffs obtained the salary information regarding the associates and staff in question through their position as partners at Breed, Abbott, it was information that could as easily have been obtained elsewhere. The concept that this information is some sort of trade secret does not comport with the realities of the practice of law.

Indeed, the characterization of this financial and employment information concerning Breed, Abbott associates and staff as confidential information would logically lead to the conclusion that it may not properly be disclosed by the partners at *any* time, even after their withdrawal, to their new partners.

Yet, an absolute prohibition against disclosing financial and employment information about firm employees once a partner has a new affiliation would be unworkable.

I conclude that the information plaintiffs disclosed to Chadbourne should not be treated as a "trade secret" or "confidential matter" since if it were, a departing attorney might have a continuing obligation not to disclose it, even after leaving the firm (*see*, Hillman, *Loyalty in the Firm*, *op. cit.*, at 1032, citing Restatement [Second] of Agency § 396 [b]).

It is only the partners' fiduciary duty, rather than the label "confidential information," that limits their right to disclose information about their present firm to members of a contemplated new affiliation, and this limitation applies only where disclosure of the information would constitute an act of direct competition with their present firm.

Finally, assuming that plaintiffs had a duty not to disclose financial information known to them concerning the department staff prior to June 19, 1991, I fail to see how Chadbourne obtained any unfair advantage in recruitment. Since no actual recruitment took place until Breed, Abbott knew of plaintiffs' intentions, Breed, Abbott's ability to take appropriate steps to attempt to retain the employees was in no way diminished. Consequently, no actionable damage can have been suffered by the disclosure of the information.

Desk Chronology Files

As to the finding of the trial court that plaintiffs breached their fiduciary duty to their former partners by taking their desk chronology files, in this respect, too, the trial court imposed a nonexistent duty. While the Court of Appeals has remarked that "abandoning the firm on short notice (*taking clients and files*) would not be consistent with a partner's fiduciary duties" (*Graubard Mollen Dannett & Horowitz v Moskovitz*, *supra*, at 121 [emphasis added]), the Court's reference to the taking of files cannot be understood to prohibit the removal, not of client files belonging to the firm, but of *duplicates* of correspondence and memos the partners themselves sent or issued.

Individual attorneys may be answerable subsequently for actions taken while still a member of their former firm. In such circumstances, these documents could be necessary to defend against, for example, claims of ethical violations or malpractice. As long as the removal of duplicate documents properly in their possession does not hinder or interfere with the former

firm's ability to continue serving as counsel for the clients, there is no reason why retaining the duplicates would constitute a breach of fiduciary duty. It does not give plaintiffs an unfair advantage in the competition for clients.

I perceive nothing in plaintiffs' conduct constituting any violation of fiduciary duty, and accordingly, I would reverse and dismiss the counterclaims in their entirety.

ROSENBERGER, J. P., and LERNER, J., concur with MAZZARELLI, J.; WALLACH and SAXE, JJ., concur in part and dissent in part in a separate opinion by SAXE, J.

Order, Supreme Court, New York County, entered October 1, 1998, which, after a nonjury trial on defendants' counterclaims, determined that plaintiffs had breached their fiduciary duty to defendants, modified, on the law, to limit such conclusion to the act of disseminating confidential employee information, and otherwise affirmed, without costs. Order, same court, entered on or about June 29, 1999, reversed, on the law, without costs, the damage award vacated, and the matter remanded for recalculation of damages in accordance with this Court's Opinion.